[No. B196916. Second Dist., Div. Three. June 25, 2008.]

YESENIA MONROY, an Incompetent Person, etc., Plaintiff and Appellant, v. CITY OF LOS ANGELES et al., Defendants and Respondents. PHOEBE P., a Minor, etc., Plaintiff and Appellant, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Reed Smith, Margaret M. Grignon, Judith E. Posner, Wendy S. Albers; R. Rex Parris Law Firm, R. Rex Parris, Stephen K. McElroy, Jason P. Fowler, Ashley N. Parris; Marlin & Saltzman, Stanley D. Saltzman and Alan S. Lazar for Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, Janet G. Bogigian, Assistant City Attorney, and Amy Jo Field, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**ALDRICH, J.—**

## I.

## INTRODUCTION

These two consolidated personal injury lawsuits were filed on behalf of two people after they were injured in a traffic accident involving a police vehicle. The jury found that the officer driving the police vehicle was not negligent and found against the two injured persons. The injured persons raise three evidentiary issues on appeal from the judgment rendered against them. We reverse.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts.*[1]

On September 4, 2004, Saturday of Labor Day weekend at approximately 10:45 p.m., Yesenia Monroy was driving a Mitsubishi Mirage eastbound on Third Street in Los Angeles. Her child (Phoebe P.) was sitting in a child safety seat in the back of the Mitsubishi.

Los Angeles Police Department Officer Felipe Jesus Arreola was operating a Los Angeles Police Department (LAPD) vehicle. His partner, Jaime Garcia, was riding as a passenger. The officers were on routine patrol on Pleasant Avenue approaching Boyle Avenue when they heard a radio call. One of the gang units in the area was requesting backup for a foot pursuit of a man with a gun.

The operator designated the call as "Code 2" and directed another police unit to respond. A "Code 2" is an urgent, but nonemergency, response request requiring those police vehicles responding to obey the rules of the road. A backup call is a Code 2.

---

[1] Following the usual rules on appeal after a trial on the merits, we construe the facts, including all conflicting facts, in the light most favorable to the verdict. (*Woodman Partners v. Sofa U Love* (2001) 94 Cal.App.4th 766, 771 [114 Cal.Rptr.2d 566]; *Finegan v. County of Los Angeles* (2001) 91 Cal.App.4th 1, 4, fn. 2 [109 Cal.Rptr.2d 762].)

Officer Arreola realized that Officer Harsma was the officer requesting backup. Officer Harsma sounded winded as he called out street names where he was located, requested assistance in setting up a perimeter, and described the suspect. The area where the call had come from bordered gang territory.

At Officer Arreola's request, Officer Garcia advised dispatch that they were "backing," i.e., they were responding to a Code 2.

At the intersection of Pleasant Avenue and Boyle Avenue, Officer Arreola made a right turn and headed southbound. It was a very short distance to the intersection of Boyle Avenue and First Street. Officer Arreola turned on his siren and his overhead emergency lights, passed through the intersection at Boyle Avenue and First Street where there was a red light, and continued southbound on Boyle Avenue toward Third Street.

Once Officer Arreola passed through the intersection of Boyle Avenue and First Street, he turned off the siren. He did not remember if he also turned off the overhead lights.

Officer Arreola accelerated. Within moments, his vehicle was almost at Third Street where he saw Monroy's vehicle. Officer Arreola applied the brakes of the patrol vehicle, but could not avoid colliding with Monroy.

Neither Officer Arreola nor Officer Garcia notified the dispatcher that either of them had upgraded the call to a Code 3. A Code 3 exempts emergency vehicles from rules of the road under certain circumstances. In his deposition, Officer Arreola testified that when he received the radio call for backup, he responded, "Code 2, Code 2 High." However, at trial, Officer Arreola testified that he initially responded to the call as Code 2, but when he turned on the siren and lights he upgraded the call in his mind to Code 3.[2]

The posted speed limit in the area of the collision was 25 miles per hour. Officer Arreola testified he was traveling between 35 and 45 miles per hour. Three experts confirmed Officer Arreola's testimony that Officer Arreola was speeding at the time of the collision. The experts estimated that the police vehicle's speed *at the point of impact* ranged between 44 and 47 miles per hour. As to pre-braking speed, one expert testified that the police vehicle was traveling at 51 miles per hour before Officer Arreola applied the brakes, and another expert testified that the pre-braking speed of the police vehicle was 65 miles per hour.

---

[2] An expert on LAPD procedure testified that "Code 2 High" was terminology that the LAPD used to signify a greater emergency than Code 2. However, in 2004, Chief William J. Bratton eliminated that terminology.

No dangerous condition of public property caused or contributed to the occurrence of the collision.

Officer Arreola and Phoebe P. suffered serious injuries. Monroy was catastrophically injured and could not give a statement or attend the trial.

### B. *Procedure.*

#### 1. *The pleadings.*

Plaintiff and appellant Cesar Augusto Monroy, as guardian ad litem for Yesenia Monroy (Monroy), and plaintiff and appellant Rosa Vilma Medina, as guardian ad litem for Phoebe P., filed separate lawsuits alleging negligence of defendants and respondents the City of Los Angeles (the City) and Officer Arreola. The two lawsuits were consolidated.

The City pled comparative fault as an affirmative defense and cross-complained against Monroy for indemnification of Phoebe P.'s damages.

#### 2. *The trial and the admissions.*

The trial court bifurcated the issues of liability and damages.

##### a. *The admissions.*

Prior to trial, the parties engaged in discovery. In response to two sets of requests for admissions, defendants made a number of admissions. In addition to others, the following admissions made by defendants later would be read to the jury:

Admission No. 44: "The LAPD has no civilian witness that heard the patrol vehicle's sirens activated at the point of impact."

Admission No. 45: "The LAPD has no civilian witness that heard the patrol vehicle's sirens activated as it . . . entered the intersection at the location of the collision."

Admission No. 64: "At the time of the collision, Officer . . . Arreola was required to obey the California Vehicle Code."

Admission No. 68: "At the time of the collision, Officer . . . Arreola had a duty to drive with due regard for the safety of all persons using Boyle Avenue."

Admission No. 69: "At the time of the collision, Officer . . . Arreola had a duty to drive with due regard for the safety of . . . Monroy."

Admission No. 71: "At the time of the collision, Officer . . . Arreola was not responding Code 3."

Admission No. 75: "At the time of the collision, LAPD policy required LAPD officers to obey the California Vehicle Code when responding Code 2."

Admission No. 77: "LAPD policy requires LAPD officers to obey the California Vehicle Code when responding Code 2."

Admission No. 83: "According to LAPD policy, a backup request is a Code 2 response."

Admission No. 84: "At the time of the collision, LAPD policy required LAPD officers to respond Code 2 when responding to a backup request."

Prior to trial, plaintiffs brought a motion in limine to exclude comments, arguments, or reference to, any exemption from compliance with the Vehicle Code or traffic laws for police vehicles under Vehicle Code section 21055; and to preclude any jury instructions or special verdict forms on the emergency vehicle exemption under Vehicle Code section 21055.[3] The trial court granted the motion without prejudice, subject to defendants establishing a sufficient foundation.

b. *The trial.*

There was extensive testimony about the meaning of "Code 2," "Code 3" and LAPD policies. Among other factual disputes, the parties contested whether Officer Arreola turned off both the siren *and* the *overhead lights* after he had gone through the intersection at First Street and Boyle Avenue.

c. *The motion to exclude expert Moen's testimony and the jury instructions.*

As noted, Officer Arreola testified at trial that in his mind he had upgraded his response to a Code 3 emergency. Thereafter, the defense called expert Ronald Nelson Moen to testify about LAPD's training with regard to Vehicle Code section 21055, which provides an exemption from liability for vehicles

---

[3] Each plaintiff was represented by different counsel and each counsel played a different role in this trial. However, for simplicity, and because the interests of the two injured persons are identical for purposes of this appeal, we discuss together counsel representing the interests of Monroy and counsel representing the interests of Phoebe P. Thus, for example, if a motion was made by counsel representing Monroy, we have stated that "plaintiffs" made the motion.

responding to an emergency call under certain situations. Plaintiffs argued that defendants' pretrial admissions made section 21055 inapplicable and preluded most of Moen's testimony. The trial court held a hearing outside the presence of the jury to determine the effect of the admissions.

In addition to other arguments, defendants asserted that the admissions read to the jury (including admissions Nos. 44, 45, 64, 68, 69, 71, 75, 77, 83, and 84) did not preclude Moen's testimony. Defendants brought to the trial court's attention three other requests for admissions (admissions Nos. 66, 70, 76) that plaintiffs had not submitted to the jury. Defendants argued these three admissions elucidated and explained the admissions relied upon by defendants, e.g., admissions Nos. 44, 45, 64, 68, 69, 71, 75, 77, 83, and 84, and thus, it was proper to admit Moen's testimony. Defendants also asserted that the evidentiary matters contained in the testimony had established a factual bases for the application of Vehicle Code section 21055.

The trial court ruled, "I find that there is enough of a factual dispute that these—in comparing your requests for admissions with [those brought to the attention of the court by defendants] plus the evidence that I've heard so far, I don't believe that you have established issue preclusion at this point in time on that basis."

After the close of evidence, the trial court instructed the jury with the law pursuant to Vehicle Code section 21055, as requested by defendants.

### d. *The verdict.*

The jury rendered a nine-to-three verdict in favor of defendants, finding Officer Areola had not been negligent. Because the jury found Officer Arreola had not been negligent, the jury did not reach the issue of comparative fault.

Plaintiffs timely appealed from the subsequently entered judgment. We reverse.

### III.

### DISCUSSION

### A. *The trial court reversibly erred in providing the jury with instructions relating to Vehicle Code section 21055.*

Plaintiffs persuasively contend that the Vehicle Code section 21055 (Section 21055) instructions contradicted explicit admissions made by defendants, and thus, the trial court erred in providing the jury with these instructions. Given the gravity of this error, reversal is required.

### 1. *Section 21055 and the LAPD Manual.*

"The provisions of [the Vehicle Code] applicable to the drivers of vehicles upon the highways apply to the drivers of all vehicles while engaged in the course of employment by [the LAPD], including authorized emergency vehicles subject to those exemptions granted such authorized emergency vehicles in [the Vehicle Code]." (Veh. Code, § 21052.)

With regard to Section 21055 and its companion statute, Vehicle Code section 21056 (Section 21056), the jury was instructed: "California Vehicle Code provides that the driver of an authorized emergency vehicle is exempt from the . . . need to observe the provisions of the Vehicle Code relating to speed limit . . . under all of the following conditions: If—A, if the vehicle is being driven in response to an emergency call; and, B, if the driver of the vehicle sounds a siren as may be reasonably necessary *and* the vehicle displays a lighted red lamp visible from the front as a warning to other drivers and pedestrians. [¶] When the foregoing requirements are met, then it is not negligence as a matter of law for the driver of the authorized emergency vehicle to fail to observe those provisions of the Vehicle Code from which the driver is exempt. [¶] This exemption, however, does not relieve the driver of such vehicle from the duty to drive with due regard for the safety of all persons, nor protect the driver from the consequences of an arbitrary exercise of the privileges granted under the exemption. [¶] An arbitrary exercise of the privileges granted means an act performed either with knowledge that serious injury to another will probably result or with wanton or reckless disregard of the possible consequences. [¶] It has been established in this case that the vehicle operated by defendant Felipe Jesus Arreola was an authorized emergency vehicle. [¶] In determining whether an emergency vehicle was being driven in response to an emergency call, the test is not whether an emergency in actual fact existed, but rather whether the driver had received a report or a request or was informed of the circumstances that would reasonably justify the driver's belief that an emergency existed to which the driver was required to respond in the line of duty." (Italics added.)

■ Plaintiffs concede that the instruction was an accurate statement of the law. Accordingly, as Section 21055 is explained in the instruction, in order for emergency responders to be exempt from the rules of the road, including the speed limit, they must be responding to an emergency call, they must sound a siren as may be reasonably necessary, *and* their vehicle must display a lighted red lamp visible from the front as a warning. (See *City of Sacramento v. Superior Court* (1982) 131 Cal.App.3d 395, 402 [182 Cal.Rptr.

443].)[4] However, as stated in Section 21056, "Section 21055 does not relieve the driver of a vehicle from the duty to drive with due regard for the safety of all persons using the highway, nor protect him from the consequences of an arbitrary exercise of the privileges granted in that section." (See *Torres v. City of Los Angeles* (1962) 58 Cal.2d 35, 47 [22 Cal.Rptr. 866, 372 P.2d 906]; *City of Sacramento v. Superior Court, supra*, at p. 402.)

■ "The effect of Vehicle Code sections 21055 and 21056 is: where the driver of an authorized emergency vehicle is engaged in a specified emergency function he may violate certain rules of the road, such as speed and right of way laws, if he activates his red light and where necessary his siren in order to alert other users of the road to the situation. In such circumstances the driver may not be held to be negligent solely upon the violation of specified rules of the road, but may be held to be negligent if he fails to exercise due regard for the safety of others under the circumstances. [Citation.] Where the driver of an emergency vehicle fails to activate his red light, and where necessary his siren, he is not exempt from the rules of the road even though he may be engaged in a proper emergency function, and negligence may be based upon the violation of the rules of the road. [Citation.]" (*City of Sacramento v. Superior Court, supra*, 131 Cal.App.3d at pp. 402–403.)

■ "Whether a vehicle is driven in response to an emergency call depends on the nature of the call received and the situation as presented to

---

[4] Section 21055 states:

"The driver of an authorized emergency vehicle is exempt from Chapter 2 (commencing with [Vehicle Code] Section 21350), Chapter 3 (commencing with Section 21650), Chapter 4 (commencing with Section 21800), Chapter 5 (commencing with Section 21950), Chapter 6 (commencing with Section 22100), Chapter 7 (commencing with Section 22348), Chapter 8 (commencing with Section 22450), Chapter 9 (commencing with Section 22500), and Chapter 10 (commencing with Section 22650) of this division, and Article 3 (commencing with Section 38305) and Article 4 (commencing with Section 38312) of Chapter 5 of Division 16.5, under all of the following conditions:

"(a) If the vehicle is being driven in response to an emergency call or while engaged in rescue operations or is being used in the immediate pursuit of an actual or suspected violator of the law or is responding to, but not returning from, a fire alarm, except that fire department vehicles are exempt whether directly responding to an emergency call or operated from one place to another as rendered desirable or necessary by reason of an emergency call and operated to the scene of the emergency or operated from one fire station to another or to some other location by reason of the emergency call.

"(b) If the driver of the vehicle sounds a siren as may be reasonably necessary and the vehicle displays a lighted red lamp visible from the front as a warning to other drivers and pedestrians.

"A siren shall not be sounded by an authorized emergency vehicle except when required under this section."

The Vehicle Code sections identified in Section 21055 address numerous traffic rules, including requiring drivers to obey speed limit restrictions.

the mind of the driver and not upon whether there is an emergency in fact. [Citations.]" (*Gallup v. Sparks-Mundo Engineering Co.* (1954) 43 Cal.2d 1, 5 [271 P.2d 34].)

The LAPD Manual (the Manual) sets forth guidelines for police vehicles when responding to radio calls. The Manual delineates the calls in order of priority beginning with Code 1, escalating the response up to Code 5.

The Manual sets forth the following: "Code 2" is "an urgent call and shall be answered immediately. The red light and siren shall not be used, and all traffic laws shall be observed." "Code 3" is an emergency call, exempting the officer from the rules of the road, and thus the driving guidelines and restrictions set forth in the Vehicle Code, "only when officers sound a siren as reasonably necessary and the officers' vehicle displays a lighted red lamp visible from the front." "Any call may justify a 'Code Three' if any of the following elements are present: [¶] A serious public hazard. [¶] The preservation of life. [¶] A crime of violence in progress. [¶] The prevention of a crime of violence. [¶] An immediate pursuit. [¶] A unit at the scene requests another unit 'Code Three.' [¶] The final decision for the use of 'Code Three,' other than in response to a directed radio call, shall be made by the vehicle operator. [¶] An officer shall immediately broadcast his intention to proceed 'Code Three' when the decision is based on other than a directed police radio call."[5]

## 2. *Discussion.*

All evidence showed that Officer Arreola was exceeding the 25-mile-per-hour speed limit at the time his police vehicle collided with Monroy's Mitsubishi. Defendants asserted that Officer Arreola was not negligent, however, because he was exempt from liability pursuant to Section 21055. Nevertheless, as plaintiffs contend, the exemption is inapplicable because defendants unequivocally admitted prior to trial that *at the time of the collision*, Officer Arreola was required to obey the Vehicle Code (admission No. 64), that at the *time of the collision*, he was not responding Code 3 (admission No. 71), and that a backup request is a Code 2 response (admissions Nos. 83, 84) requiring the responding officer (Officer Arreola) to obey the Vehicle Code (admissions Nos. 75, 77).

Code of Civil Procedure section 2033.010 et seq. authorizes parties to propound requests for admissions. A matter admitted in a response to a request for admissions is "conclusively established against the party making

---

[5] The Manual specifies an exception to the Code 3 response. This exception is not applicable to the case before us.

the admission . . . unless the court has permitted withdrawal or amendment of that admission . . . ." (Code Civ. Proc., § 2033.410, subd. (a); see *Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 736 [49 Cal.Rptr.3d 511].) Trial courts have the discretion to consider parol evidence that explains an admission. (*Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 277–278 [234 Cal.Rptr. 395].) However, while courts may utilize evidence to elucidate and explain an admission, they cannot use such evidence to contradict the plain meaning of a response to a request for admissions. (*Ibid.*) If a response to a request for admission is unambiguous, and is not subject to different meanings, the matter admitted is conclusively established. (Cf. *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1273 [127 Cal.Rptr.2d 436].)

Here, the testimony was consistent in some key aspects. The parties agreed that when Officer Arreola decided to respond to the backup request, he was responding to a backup, a Code 2 call. Therefore, he was required to obey all rules of the road, including that he could not exceed the 25-mile-per-hour speed limit. He could upgrade the call to a Code 3 emergency and be exempt from the rules of the road pursuant to Section 21055 *only if* he sounded the siren as reasonably necessary *and* displayed red lighted lamps visible from the front of his vehicle as a warning. However, defendants admitted that "*At the time of the collision*, Officer . . . Arreola was *not* responding Code 3." (Admission No. 71, italics added.) By this admission, it was conclusively established that Officer Arreola was required to drive within the posted 25-mile-per-hour speed limit *at the time of the collision*. Further, defendants admitted that "[a]t the time of the collision, Officer . . . Arreola was required to obey the California Vehicle Code." (Admission No. 64.) Hence, defendants admitted that Officer Arreola was required to obey the speed limit. Section 21055 is an *exception* to the Vehicle Code. It is illogical to argue, as defendants do, that because Section 21055 is part of the Vehicle Code, Officer Arreola was "obeying" the Vehicle Code when he exceeded the 25-mile-per-hour speed limit.

Contrary to defendants' argument, the admissions precluded the conclusion that although Officer Arreola was responding to a Code 2 backup request, he reasonably upgraded the emergency status in his mind to a Code 3 emergency call. The admissions plainly stated that, *at the time of the collision*, Officer Arreola was required to obey the Vehicle Code and was *not* responding Code 3. (Admissions Nos. 64, 71.) Because he was not responding Code 3, the exemption of Section 21055 did not apply and the trial court erred in instructing with that section. Given the unambiguous reading of the instructions, there is not room for explanation.

■ Further, the three requests for admissions that were not submitted to the jury (admissions Nos. 66, 70, 76) cannot be used to explain those that had

been conclusively established. The only purpose of requests for admissions is that the matters admitted can be used *against* the party making them. (Code Civ. Proc., § 2033.410, subd. (a).)

Therefore, the trial court erred in instructing the jury with Section 21055.

Further, this instructional error was prejudicial. All testimony showed that Officer Arreola was speeding. Yet, the jury found that he was not negligent. Defendants concede that given the facts and arguments presented, when the jury found that Officer Arreola had not been negligent, the jury impliedly accepted defendants' defense based upon Section 21055. Without this critical instruction, it is reasonably probable that the jury would have reached a different result.

The instructional error requires reversal.

B. *The trial court abused its discretion in excluding the deposition testimony of De Los Santos. This error was prejudicial.*

Plaintiffs' contention that the trial court abused its discretion in excluding the deposition testimony of independent witness Juan De Los Santos is persuasive. Further, given the importance of his testimony, this error was prejudicial, requiring reversal.

1. *Additional Facts.*

At the time of the accident, Juan De Los Santos was selling tacos from a vending cart near the intersections of Pleasant Avenue, Boyle Avenue, and First Street. He was deposed about five months before trial. De Los Santos testified that he heard the siren and saw the police vehicle before it entered the intersection at Boyle Avenue and First Street, until it collided with Monroy's car. He further testified that he saw the police vehicle's overhead lights being turned on and that thereafter, *both* the lights and the siren were turned *off*. De Los Santos was the only civilian witness who could support plaintiffs' argument that the *overhead lights* on the police vehicle were *off* at the time of the collision.

De Los Santos also testified to the following: He had resided in Los Angeles since 1991. He was in the process of obtaining a divorce and he planned to "go" to Mexico to open a restaurant. Because he was subpoenaed to appear for his deposition, he stayed in the United States for an additional 10 days and planned to leave a couple of days after the deposition. He did not expect to return to Los Angeles if his business was doing well. He offered to

return to Los Angeles to testify at trial if plaintiffs paid for his lost wages and airfare. Over objection, he testified that he was not a legal resident.

At the end of the deposition, the parties recognized that it might be difficult to arrange for De Los Santos to review the deposition transcript with a court-certified interpreter. The parties agreed that, if this could not be arranged, an unsigned copy could be used as an original.

During trial, plaintiffs indicated they would be seeking to introduce De Los Santos's deposition testimony. The trial court noted that plaintiffs should be prepared to prove that De Los Santos was not available to testify at trial. (Code Civ. Proc., § 2025.620, subd. (c)(2)(E).)

The next court day, on Monday, November 13, 2006, the trial court held a hearing outside the presence of the jury to determine if De Los Santos's deposition was admissible. (Evid. Code, § 402.) At the hearing, plaintiffs presented the testimony of Randy Mehringer, a private investigator. Mehringer testified that he was hired by plaintiffs to serve a subpoena on De Los Santos. Mehringer further testified to the following: On Saturday and Sunday, November 11 and 12, 2006, one and two days prior to the hearing, he tried to serve De Los Santos with a subpoena at De Los Santos's house. On the second visit, Mehringer spoke with Teresa Gutierrez, who identified herself as De Los Santos's wife. Mehringer gleaned from information provided to him by Gutierrez that De Los Santos was in Puebla, Mexico, with no future plans to return to the United States. Mehringer could not provide any information as to whether or not De Los Santos was a legal resident of the United States. Mehringer also testified that his investigative firm had been unsuccessful in locating De Los Santos during the previous couple of months.

Plaintiffs argued that Mehringer's testimony had established that De Los Santos was unavailable to testify at the trial and, thus, his deposition testimony was admissible. Defendants asserted that plaintiffs had not been diligent in trying to locate De Los Santos, primarily because plaintiffs had waited until two days before the day they wished to introduce the deposition testimony to try to serve De Los Santos with a subpoena.

The trial court denied plaintiffs' request to introduce De Los Santos's deposition testimony concluding that there had been no showing of diligence in securing De Los Santos's appearance.

After the trial court ruled, plaintiffs inquired, "Will the court's ruling be without prejudice to additional evidence on that issue?" To which the trial court replied, "Well, the court's ruling applies for today. Obviously . . . you may make that request. And at that time, depending on what [defense counsel] says, we'll deal with it."

The trial proceeded. At the end of that same day, plaintiffs' counsel informed the trial court that they had obtained a telephone number for De Los Santos and had contacted him in Puebla, Mexico, a city that was south of Mexico City. Plaintiffs' counsel also informed the court that they had been in contact with Gutierrez. The trial court stated that it had ruled on the issue of admitting De Los Santos's deposition and suggested plaintiffs bring the deponent to the trial. Plaintiffs' counsel expressed surprise at the trial court's statements, because they had understood that the earlier ruling was without prejudice.

The next day, plaintiffs' counsel again raised the issue of the admissibility of De Los Santos's deposition testimony. The trial court reiterated its position that plaintiffs had not established unavailability and stated, "if you have more that you want to present on the basis of unavailability, I think it's appropriate for me to allow you to present it. The witness being unavailable is not . . . subject to a final ruling, however, once you present all of your evidence, I'm not going to allow you to present the same thing over again."

At the end of trial, plaintiffs sought to reopen the case and asked the trial court to reconsider its prior ruling. Plaintiffs argued that De Los Santos's deposition testimony was admissible because he resided more than 150 miles from the place of trial (Code Civ. Proc., § 2025.620, subd. (c)(1)).

The trial court conducted a hearing outside the presence of the jury. Gutierrez took the stand and testified to the following: By the end of May 2006, she was no longer married to De Los Santos. The last time she had seen De Los Santos was on September 29, 2006, when he had visited her. At that time, De Los Santos told her that he was going back to Mexico. Since that date, she had talked to De Los Santos four times. The first two times she had called him by dialing a United States cellular telephone number and the second two times she had dialed a Mexican cellular telephone number. The last telephone call occurred the day before the hearing, during which De Los Santos had stated that he was living in Puebla, Mexico, with his mother. De Los Santos told Gutierrez he had been in an automobile accident and could not travel. Gutierrez also testified that De Los Santos was a Mexican citizen without a visa.

Plaintiffs argued that those parts of Gutierrez's testimony that were hearsay were admissible pursuant to the family history exception. The trial court disagreed and excluded as hearsay all of Gutierrez's testimony to the extent she reported what De Los Santos had told her. The trial court ruled that Gutierrez's testimony that she was no longer married to De Los Santos by the end of May 2006 was admissible under the family history hearsay exception (Evid. Code, § 1310, subd. (a)).

The trial court denied plaintiffs' motion to admit De Los Santos's deposition testimony on three grounds—as a motion to reopen, as a motion for reconsideration, and because Gutierrez's testimony did not establish that De Los Santos resided more than 150 miles from the courthouse. The trial court provided the following explanation for its ruling: De Los Santos's children lived in Los Angeles; Gutierrez was unclear as to whether or not she was married to De Los Santos; De Los Santos had cellular telephones with both United States and Mexican numbers; when answering a cellular telephone call, De Los Santos could be anywhere; and Gutierrez's "statements regarding what Mr. De Los Santos said were hearsay."

### 2. *Discussion.*

We first note that the trial court's comments during trial were ambiguous as to whether the original motion was denied without prejudice. Thus, plaintiffs cannot be faulted for asking the trial court to revisit the issue. Additionally, we hold that the trial court abused its discretion in refusing to allow the introduction of the deposition testimony of De Los Santos.

Code of Civil Procedure section 2025.620, subdivision (c)(1) permits the introduction of deposition testimony in lieu of live testimony if "[t]he deponent resides more than 150 miles from the place of the trial or other hearing." Unavailability need not be shown. Hearsay can be used to provide the foundation to establish that a deponent resides 150 miles from the courthouse (e.g., *Topanga Corp. v. Gentile* (1967) 249 Cal.App.2d 681, 689–690 [58 Cal.Rptr. 713]). We will take judicial notice that Puebla, Mexico, is more than 150 miles from the courthouse at 111 North Hill Street, Los Angeles, California. (Evid. Code, § 452, subd. (h); *Dept. of Social Welfare v. Gandy* (1942) 56 Cal.App.2d 209, 211 [132 P.2d 241] [judicial notice that Santa Monica is less than 100 miles from Los Angeles].)

Every fact before the trial court showed that De Los Santos resided 150 miles from the courthouse. In his deposition testimony, De Los Santos testified under oath that he did not have legal residency. He also testified that he was in the process of obtaining a divorce and he was going to Mexico to open a restaurant. It is apparent that the parties understood that De Los Santos would be in Mexico because they agreed that if there were problems in obtaining a certified translator to assist De Los Santos in reviewing the deposition transcript, the transcript could be used without signature. Mehringer testified that Gutierrez told him that De Los Santos was no longer residing with her in the United States. Mehringer learned from Gutierrez that De Los Santos was in Puebla, Mexico. After the trial court denied plaintiffs' first motion to submit De Los Santos's deposition testimony, plaintiffs' counsel contacted De Los Santos in Puebla, Mexico. At the end of the trial, plaintiffs made a

second motion requesting that De Los Santos's deposition testimony be read to the jury. At this time, Gutierrez testified she was no longer married to De Los Santos. She further testified that, while De Los Santos had been in the United States in September 2006, he had informed her that he was going back to Mexico. When Gutierrez first contacted De Los Santos by telephone after the September 2006 visit, she reached him through a United States cellular telephone number. Thereafter, however, Gutierrez called a Mexican cellular telephone number. Further, De Los Santos informed Gutierrez that he had been in an automobile accident, was unable to travel, and was living in Puebla, Mexico, with his mother. Lastly, Gutierrez testified that De Los Santos was a Mexican citizen without a visa. This was consistent with De Los Santos's deposition testimony that he did not have legal residency.

Thus, all information before the trial court was consistent and led to one conclusion—De Los Santos resided in Puebla, Mexico, more than 150 miles from the courthouse. There were no facts to suggest that the information before the trial court was unreliable. Thus, there was no reason for the trial court to reject this evidence, much of which described De Los Santos's family history and all of which was uncontradicted. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518]; Evid. Code, § 1310; see *Estate of Berg* (1964) 225 Cal.App.2d 423, 431–432 [37 Cal.Rptr. 538] [hearsay statements that alter familial relationships are admissible].)

Further, after the initial ruling, plaintiffs acted quickly. They obtained a telephone number for De Los Santos and contacted him in Mexico. Plaintiffs contacted Gutierrez and secured her attendance at court to present additional evidence. Additionally, as discussed below, De Los Santos's testimony was invaluable. Thus, plaintiffs made a showing of good cause and due diligence, and brought forth new evidence that demonstrated De Los Santos's deposition testimony was admissible. (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 180, p. 206 [discussion of burden on motion to reopen]; Code Civ. Proc., § 1008 [burden on reconsideration motion].)

■ Although trial courts have broad discretion in ruling on the admissibility of evidence (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 [69 Cal.Rptr.3d 273]; *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885 [57 Cal.Rptr.3d 454]), in ruling on motions to reopen the evidence and on motions for reconsideration (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208–209 [29 Cal.Rptr.3d 717]; *County of Los Angeles v. James* (2007) 152 Cal.App.4th 253, 256 [60 Cal.Rptr.3d 880]), that discretion must be exercised reasonably. Here, all facts before the trial court showed that De Los Santos resided more than 150 miles from the courthouse in Puebla, Mexico. Since there was no reason to reject these facts,

the trial court abused its discretion in declining to permit plaintiffs to introduce De Los Santos's deposition testimony.

Also, this error was prejudicial. A pivotal fact was whether Officer Arreola turned off the overhead lights when he turned off the siren. More than seven percipient witnesses and numerous expert witnesses addressed this issue. Most saw the two cars after the collision. Some witnesses, such as a criminalist expert, testified about whether physical evidence from the police vehicle could assist in determining if the overhead lights were on at the time of the accident. But, only one civilian witness testified that he had seen the police vehicle both before and after the accident and the overhead lights were *on*. De Los Santos's testimony would have directly contradicted this witness and would have provided plaintiffs with crucial evidence to prove that the overhead lights on the police vehicle were *off* at the time of the collision. The importance of De Los Santos's testimony was recognized by both plaintiffs and defendants. In opening statement, Monroy's counsel stated that the "big question" was whether the police vehicle's overhead lights were on. In closing, defense counsel noted that plaintiffs had no witness who saw what happened before the accident.

Therefore, the trial court's refusal to permit the introduction of De Los Santos's highly relevant testimony on a key factual dispute was prejudicial and warrants a new trial.

C. *The trial court abused its discretion in limiting expert witness testimony.*

Plaintiffs' last contention that the trial court abused its discretion in limiting testimony is persuasive. This contention is based upon the trial court's rulings restricting the examination of experts.

The trial court permitted only one expert to testify to the same opinion, including percipient witnesses, regardless of which party elicited the testimony. Thus, for example, plaintiffs were permitted to call a witness in their case-in-chief, but were precluded from asking other experts to render an opinion on the same issue. At times, this prevented plaintiffs' experts from rendering an opinion that already had been elicited from a defense expert or from police personnel. For example, the parties contested whether the police vehicle's high beams on the headlights were off or on at the time of the collision. Plaintiffs first called an LAPD criminalist to testify on this issue. However, when plaintiffs sought to introduce evidence from their own accident reconstruction expert on the same issue, the trial court severely curtailed the questioning.

Trial courts may not use their powers to control the orderly conduct of the proceedings, to prevent cumulative evidence (Code Civ. Proc., § 128, subd. (a)(3)), and to limit the number of expert witnesses (Evid. Code,

§§ 723, 352; *Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371 [131 Cal.Rptr. 78, 551 P.2d 398]; *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 906 [85 Cal.Rptr.2d 301]; *Scalere v. Stenson* (1989) 211 Cal.App.3d 1446, 1454 [260 Cal.Rptr. 152]), if it destroys a plaintiff's evidentiary presentation. Overly restrictive limitations on the introduction of evidence and on the method and manner of presenting a case can undercut a plaintiff's case by preventing that party from presenting evidence in an organized and coherent way. Even if a defense expert will testify to the same conclusion as a plaintiff's own expert, the testimony will not be identical, will have different focuses, and will be accompanied by different explanations. Subtleties in responses can be critical. Repetition is often the key to believability, and credibility may be enhanced when a defense expert agrees with a plaintiff's expert. Identical or virtually identical evidence may not be cumulative if there is significance to the evidentiary weight to be given. (See *People v. Carter* (1957) 48 Cal.2d 737, 748–749 [312 P.2d 665]; *Basham v. Babcock* (1996) 44 Cal.App.4th 1717, 1724 [52 Cal.Rptr.2d 456].) It is often invaluable to have evidence come from different sources.

The trial court also severely limited plaintiffs' cross-examination of the defense's main witnesses, even if the expected responses would have taken little time and would have addressed major factual issues. These restrictions failed to recognize the importance of cross-examination, which is crucial, especially of expert witnesses.

Furthermore, it must be observed that cross-examination is much more art than science. A skillful cross-examiner can fatally injure the opponent's case and gain admissions that can strengthen his or her own. The recognition of these principles is even more important when cross-examining an adverse *expert* witness. The successful cross-examiner will attack not only the opinions and conclusions of the expert but also the factual underpinnings and rationale used by the expert in forming them. This frequently requires not only repetitive questions, but also asking the same question in different styles and ways. It can require a laborious construct of foundational facts and the use of hypothetical questions in order to demonstrate that the expert's opinion is untenable, illogical, or inapt under the facts of the particular case being litigated. Cross-examination is frequently the measure that tips the scale in persuading the jury to accept the cross-examiner's position and fatally wounds the case of the opposition.

While there can be no hard and fast rule regarding the limits of cross-examination, a trial court's rulings should not be so overly restrictive as to deprive trial counsel of the tools necessary to probe, test, and even discredit the adverse expert witness.

The trial court's unduly restrictive rulings constituted an abuse of discretion and are still another reason requiring reversal.

## IV.

## DISPOSITION

The judgment is reversed. Defendants are to bear costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied July 17, 2008, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 10, 2008, S165673.