Filed 11/18/24  Tinsley v. Arnold CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HARRISON RANDALL TINSLEY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>LAUREN LOUISE MARTIN ARNOLD,<br><br>    Defendant and Respondent. | A167677<br><br>(San Francisco City & County Super. Ct. No. FPT20377700) |

Appellant Harrison Randall Tinsley and respondent Lauren Louise Martin Arnold were ordered to have joint custody of their now four-year-old child (Minor) in 2021.  After the denial of his request for sole custody, Tinsley moved for reconsideration.  Tinsley also requested a temporary restraining order (TRO) and domestic violence restraining order (DVRO) against Arnold.  The trial court granted the TRO and set the other matters for evidentiary hearing.  After the hearing, the trial court terminated the TRO and denied both the DVRO request and the motion for reconsideration.

On appeal, Tinsley argues that the trial court (1) abused its discretion and violated his right to a full and fair trial by imposing time limits on the evidentiary hearing; (2) abused its discretion by failing to find Arnold's purported violation of the TRO or social media posts constituted "abuse"

1

warranting issuance of a DVRO; and (3) abused its discretion by denying Tinsley's request for sole custody without making certain findings. We disagree and affirm.

## I. BACKGROUND

In 2021, the trial court ordered that Tinsley and Arnold share joint physical and legal custody of Minor. Several months later, Tinsley filed an ex parte request for temporary emergency orders granting him sole custody. Among other things, Tinsley declared there had been an incident in September 2021 where police were called to Arnold's residence and Minor had fallen off a bed. Arnold also filed a declaration, stating that Minor had not sustained any injuries. Child Protective Services (CPS) issued a report concluding that the allegations of physical and emotional abuse were unfounded, and that Minor was not at risk. The trial court denied Tinsley's request for sole custody, finding that what had happened was an "isolated incident" and "essentially an accident."

Tinsley moved for reconsideration of that order. He argued that there were new facts based on unredacted police body camera footage that rebutted Arnold's version of the September 2021 incident and the conclusions from the CPS report.

Tinsley then filed a DVRO request against Arnold naming both himself and Minor as potential protected persons and seeking sole custody. Tinsley alleged, among other things, that Arnold had committed abuse by publishing "public social media posts referring to me as her rapist." Tinsley also filed a

TRO request. Meanwhile, Arnold requested findings under Family Code section 3044.[1]

The trial court issued a TRO protecting only Tinsley and set an evidentiary hearing for (1) Tinsley's DVRO request, (2) Tinsley's motion for reconsideration, and (3) Arnold's section 3044 request. After the hearing, the trial court denied both requests and the motion for reconsideration. It found that Arnold had not perpetrated domestic violence against Tinsley, and that there were no new facts sufficient to warrant reconsideration of its order denying sole custody to Tinsley. It also found that section 3044 did not apply in this case. The court terminated the TRO.

This appeal followed.

## II. DISCUSSION

### A. *Time Limits on Evidentiary Hearing*

#### 1. Additional Background

On August 25, 2022, the trial court set an evidentiary hearing for four afternoons on the DVRO request, motion for reconsideration, and request for section 3044 findings. Neither party objected to this schedule.

On September 7, 2022, the trial court reiterated to the parties that the hearing was set for four half days. Again, neither party objected. Tinsley's counsel confirmed his understanding of the dates, and the court explained those dates "will not change." The trial court also noted that, "since we only have four half days having a streamline present[ation], I think it will be

---

[1] Undesignated statutory references are to the Family Code. Section 3044, subdivision (a) provides, in relevant part: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child."

beneficial, not only to the parties and counsel, but also to the Court to have a very, very clear structure in mind for those dates."

At the outset of the first day of trial, the court again reminded the parties that they had four afternoons, with approximately "two hours each afternoon" and "an eight-hour hearing total." It continued: "[B]ecause both of the sides have issues, you can presume that each side will then have four hours, but that was delineated before we set the hearing; that was made clear, so – and those are the parameters, and the Court is not going to go over four afternoons . . . the Court has reviewed the docket, the filings, the allegations, the RFO." Neither party objected. On this first day, Tinsley called two witnesses (police officers on scene during the September 2021 incident) and several exhibits were admitted into evidence.

On the second day of trial, Arnold called a physician to testify about Minor's treatment and medical records. Tinsley's counsel conducted cross-examination. Arnold's counsel made numerous objections—including for questions outside the scope of direct examination, lack of foundation, vagueness, and hearsay—many of which were sustained. When ruling on one of these objections, the trial court clarified that Tinsley's counsel was "not eating [Arnold's] time" but instead "burning his time," and that "he can use his time however he likes."

The court later stated: "In order to help the parties along, I think both of the parties should be reaching out to the Clerk to see how they are doing on time. [¶] . . . [¶] [T]he rule is the parties get just about equal amount of time. They can use it however they like." The court noted it had "sustained a lot of objections on both sides," given "the way the evidence is coming in and the way the questions are being formed on either side." It continued: "In the next two days, we can try to streamline that. . . . It is a matter of being more

4

efficient and getting to the essential, relevant questions. [¶]. . .[¶] Then it is up to you to make a strategic decision on how you are going to get the most relevant things into evidence.  I will leave that up to you."

On the third day of trial, the court again informed the parties that they should be calculating their remaining time.  Tinsley had used two hours and 40 minutes.  Tinsley then testified on direct examination and exhibits were admitted into evidence.  Arnold's counsel again made several objections, many of which were sustained.

On the fourth day of trial, Tinsley's direct examination continued and additional exhibits were admitted into evidence.  By the end of this day, Tinsley had used four hours and 52 minutes (versus Arnold's one hour and 31 minutes).  While noting the parties had been "extremely inefficient," the trial court allowed the hearing to proceed to a fifth day.

On the fifth day of trial, the court stated that it would allow Tinsley's counsel to ask two more questions of Tinsley, and then five questions on cross-examination of Arnold.  The remaining two hours would be for Arnold. The court noted that, even shifting an hour of used time from Tinsley to Arnold based on objections, the parties would still have had roughly equal time.  After both parties had exhausted their time, the trial court permitted the parties to submit closing statements in writing.

### 2. Analysis

"A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22 (*California Crane*).)  This includes "the power of the court to impose time limits before the trial commences." (*Ibid*.)  Indeed, Evidence Code section 352 "expressly empowers trial judges to limit the

5

presentation of evidence, even evidence that is relevant and probative." (*California Crane*, at p. 19.)

We review the imposition of time limits on a trial for abuse of discretion. (*California Crane*, *supra*, 226 Cal.App.4th at p. 22.) Tinsley offers three arguments to support his position that the trial court abused its discretion here. None is persuasive.

First, Tinsley argues that the trial court imposed unreasonable time limits and did so after the evidentiary hearing had already commenced. Specifically, Tinsley suggests that the court did not allow the parties any "input" before setting the hearing for four afternoons. But the trial court set this schedule *months* before the evidentiary hearing, at which point the parties had the opportunity to offer such input or otherwise object. (See *California Crane*, *supra*, 226 Cal.App.4th at p. 20 [noting courts should invite estimates and comment from parties, and then conduct its own independent evaluation for setting time limits].) Neither party did so.

Tinsley also suggests that the trial court injected "ambiguity" into the time limits by initially describing them in days (four afternoons), but later by hours (eight hours). "Time limits may be stated in terms of court *days* or court *hours*." (*California Crane*, *supra*, 226 Cal.App.4th at p. 20.) The court's calculation of two hours for the presentation of evidence and testimony per afternoon did not exceed the bounds of reason. Nor does it support Tinsley's position that any limit was imposed after trial had commenced, as the court reminded the parties of the four-afternoon limit (and stated its calculation of eight hours) at the outset of the first day.

Second, Tinsley argues that it was unreasonable to afford the parties equal time to present their case, as his exhibit list contained 81 exhibits containing "over 800 pages of evidence and eight hours of body camera

footage," and his witness list contained seven witnesses. While a trial court may adjust time limits for good cause (*California Crane*, *supra*, 226 Cal.App.4th at pp. 21–22), Tinsley offers no authority to support his position that the sheer volume of these lists—identifying evidence likely to have consumed far more than the four afternoons allotted for the entire hearing—required the trial court to deprive Arnold of an equal amount of time here.

Third, Tinsley argues that the trial court failed to properly "manage" objections by Arnold's counsel, which "depleted" his trial time. But as correctly noted by the trial court, these objections were based on the formation of questions by Tinsley's counsel and many were sustained. The trial court also correctly noted that Tinsley had used an extra hour of hearing time, which counterbalanced any concern regarding undue consumption of time by objections.

Beyond these arguments regarding abuse of discretion, Tinsley also contends that he was denied a full and fair trial by the limitation of his cross-examination of Arnold. A trial court's authority to impose time limitations is subject to a party's right to be heard and "have his day in court." (*California Crane*, *supra*, 226 Cal.App.4th at p. 22.) Denial of this right constitutes reversible error. (*Id.* at pp. 22–23, citing *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291.) But absent such a denial, " '[n]o form of civil trial error justifies reversal . . . where in light of the entire record, there was no actual prejudice to the appealing party.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.)

The trial court's limitation of Tinsley's cross-examination here was not reversible error, but instead a reasonable enforcement of the time limits it had imposed. (*California Crane*, *supra*, 226 Cal.App.4th at p. 22 ("[I]n those

cases in which the trial court imposes time limits, it is also important that those limits be enforced"].)  Both before and during the evidentiary hearing, the court repeatedly reminded the parties of the schedule and time allotted to each side.  It noted the potential benefit of trying to "streamline," but that each party must make their own "strategic decision" on how to present evidence.

The court also repeatedly provided Tinsley with information regarding his use of time.  During a lengthy cross-examination, the court clarified that Tinsley was using his time (not Arnold's) and could do so "however he likes."  Halfway through the hearing, the court informed Tinsley he had already used most of his time.  Then, after Tinsley had used almost an hour beyond his allotted time, the court still permitted five questions for cross-examination of Arnold.

Litigants do not have "*camping rights*" entitling them to "take whatever time" they believe necessary for their presentation of evidence and examination of witnesses.  (*California Crane*, *supra*, 226 Cal.App.4th. at p. 19.)  "This view is not only contrary to law but undermines a trial judge's obligation to be protective of the court's time and resources as well as the time and interests of trial witnesses, jurors and other litigants waiting in line to have their cases assigned to a courtroom." (*Ibid.*)  Tinsley argues that *California Crane* is distinguishable because the appellants in that case spent almost seven days examining three witnesses, while he had not "wasted" trial time here. (*Id.* at p. 23.)  But regardless of how the record may be characterized, it shows that Tinsley decided to use the entirety of his time on other evidence and witnesses.  The limitation on cross-examination of Arnold was of Tinsley's own making.

In sum, we conclude that the court did not abuse its discretion or deny Tinsley's right to a full and fair trial in imposing time limits on the evidentiary hearing.

**B. *Finding of No "Abuse" on DVRO Request***

### 1. Additional Background

After granting the initial TRO, the trial court entered first and second amended versions in August and September 2022, respectively. Among other things, the second amended TRO restrained Arnold from "disturb[ing] the peace" and included a no-contact order except for "brief and peaceful contact to communicate regarding legal custody matters." It also included a 100-yard stay-away order except to "briefly and peacefully exchange" Minor for court-ordered visits, and to visit with Minor "for court-ordered contact or visits."

Tinsley subsequently filed a declaration stating that Arnold had violated the TRO in October 2022 by coming into contact with him in a hospital waiting room before Minor's medical appointment to have some stiches removed.

At the evidentiary hearing, Tinsley admitted into evidence photographs purporting to show that Arnold was in the waiting room with him and Minor. Tinsley also admitted into evidence screenshots of social media posts by Arnold, including one post with the text: "Judge Evangelista granted my rapist 50/50 custody of [Minor] starting immediately." Tinsley presented officer testimony and admitted into evidence police body camera footage that included a statement by Arnold's roommate that she had purportedly been told by Arnold that Tinsley was a rapist.

After the hearing, the trial court concluded that Arnold had not perpetrated domestic violence against Tinsley, in that they had not "cyberstalked . . . harassed, disturbed the peace of, annoyed, battered or

9

destroyed the property" of Tinsley or Minor.  It found that Arnold had testified credibly and the evidence had shown that Arnold "did not intend to 'defame or slander,' harass, annoy or disturb the peace" of Tinsley in the posts.  The posts were made on non-public accounts and did not refer to Tinsley by name.  Instead, they were "meant to be used as a source to vent, refer to [Minor's] support network, reference gender politics, thank loved ones who have been by their side and express the ability to co-parent with people with different values."

The court found Tinsley did not have access to these social media accounts, as he and his family and friends had been blocked by Arnold, but Tinsley's sister had gained access to the accounts without Arnold's "knowledge or informed consent."  It found there was no evidence presented that anyone other than Tinsley's sister had access to or saw the posts, and no credible evidence that Tinsley was injured by the posts.  The court also found that Arnold believed they were raped, but that Tinsley's "unwanted sexual advance(s)" were not proven by Arnold to be rape or attempted rape.

### 2. Analysis

The Domestic Violence Prevention Act (DVPA) (§ 6200 et seq.) authorizes a trial court to issue a restraining order based on "reasonable proof of a past act or acts of abuse."  (§ 6300, subd. (a).)  "Abuse" is defined under the DVPA to include "any behavior that has been or could be enjoined pursuant to Section 6320."  (§ 6203, subd. (a)(4).)  Such behavior includes "disturbing the peace of the other party," which has been interpreted to mean "conduct that destroys the mental or emotional calm of the other party." (§ 6320, subd. (a); *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*).)

10

We review the denial of a DVRO request for abuse of discretion as " ' " 'granting, denial, dissolving or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case.' " ' " (*Nadkarni*, *supra*, 173 Cal.App.4th at p. 1495.) Again, Tinsley offers three arguments to support his position that the trial court abused its discretion here.

First, Tinsley argues that the court failed to make "necessary" factual findings in its order regarding whether the purported TRO violation or statements calling him a "rapist" constituted abuse under the DVPA. We are not persuaded.

Section 6340, subdivision (b) requires that the *denial* of a DVRO request include only a "brief statement of the reasons for the decision in writing or on the record." In *Salmon v. Salmon* (2022) 85 Cal.App.5th 1047, the appellate court rejected an argument much like the one Tinsley makes here, concluding that section 6340 does not require "detailed factual findings" on "all factors" in determining whether relief is appropriate. (*Salmon v. Salmon*, at p. 1060.)

Tinsley's DVRO request included numerous allegations of abuse beyond those raised in this appeal: physical violence by Arnold against Minor, Arnold's roommate, and Tinsley, as well as unauthorized entry into Tinsley's home and destruction of property, threats of arson, false statements about Minor's medical condition, and other defamatory statements about Tinsley. The trial court's order addressed many of these allegations and made findings that no credible or admissible evidence had been presented to prove such allegations.

11

Tinsley's suggestion that the absence of explicit factual findings for every allegation shows a failure to even "consider" the related evidence is not supported by authority or the record. Tinsley's citation to *Bailey v. Murray* (2024) 102 Cal.App.5th 677 is inapposite, as that case involved an evidentiary ruling. (*Id.* at p. 686 [affirming decision to allow testimony about sexual assault not specifically alleged in the DVRO request as it involved same category of abuse].) Here, the court allowed testimony and admitted evidence related to the TRO and "rapist" statement allegations.

Tinsley's other citation to *Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166 is easily distinguishable. In that case, the victim had requested a DVRO because she was " 'in fear of [her] life.' " (*Id.* at p. 1170.) She testified regarding numerous incidents of abuse over the prior decade, and presented texts documenting threats as well as sworn statements from witnesses of the abuse and her resulting injuries. (*Id.* at pp. 1170–1172.) The trial court denied the DVRO request, stating that " 'despite the fact that Ms. Vinson repeats that she's been repeatedly threatened by Mr. Kinsey, she repeatedly goes back and has contact with Mr. Kinsey. So it's clear to the Court that she's not particularly concerned about his comment that he will kill her. . . . [I]t has no meaning.' " (*Id.* at pp. 1173–1174.) The appellate court reversed the ruling, as it reflected an erroneous understanding of the term "threatening" under the DVPA and "gave no indication it considered the evidence Vinson submitted of additional threats and repeated verbal and physical abuse." (*Vinson*, at p. 1180.)

Unlike *Vinson*, there is sufficient evidence that the court considered the evidence presented here. When the court permitted the parties to submit closing statements in writing, it explicitly directed them to address the "allegation of the restraining order" and the "allegation . . . in connection with

some of the [social media] posts," as it would need to determine whether Tinsley had met his burden of proof on those issues. The court's ultimate order denying the DVRO request explicitly referenced the TRO and Tinsley's allegation that Arnold had violated it, as well as Arnold's social media posts. The order was also explicit that the court had considered "the pleadings, testimony, evidence and arguments," and found that Arnold had not perpetrated domestic violence against Tinsley. We conclude that the trial court complied with its directive under section 6340, subdivision (b) to provide a "brief statement of the reasons" for its denial.

Second, Tinsley argues that there was undisputed evidence proving Arnold violated the TRO, and a TRO violation constitutes "per se abuse" mandating issuance of a DVRO. As a preliminary matter, we do not accept the assumption that Tinsley had proven a violation of the TRO. Tinsley points to the photographs showing Arnold in the hospital waiting room with him and Minor in October 2022, but the trial court could have, for example, concluded that such contact fell within an exception of the stay-away order for "court-ordered contact" with Minor related to his medical care.

Even accepting this assumption, we are still unpersuaded by Tinsley's argument that a TRO violation constitutes "per se abuse" mandating a DVRO. The express language of section 6300, subdivision (a) is discretionary, not mandatory: it provides that a trial court "may" issue a restraining order upon reasonable proof of abuse. And while the case law cited by Tinsley affirms that evidence of a restraining order violation should be considered and may lend " 'very significant support' " for further orders, such a determination must still be made in the totality of circumstances of each case. (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 400 [trial court erroneously required a showing of ongoing harassment, post-order

13

abuse, and physical violence to renew the order]; *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 110 [trial court erroneously refused to consider evidence of abuse committed after the request for order]; *Nadkarni, supra*, 173 Cal.App.4th at p. 1495.)

In *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, for example, the victim filed a DVRO request based on numerous violations of the TRO: her husband had stalked her at her apartment complex, followed her after child visitation exchanges, given her letters and gifts, asked for hugs or kisses, discussed their relationship, and threatened custody disputes. (*Id.* at pp. 598–601.) The trial court denied the DVRO request, describing the TRO violations as " 'technical' " and stating it was " 'not aware of the authority that says a violation of a TRO is in and of itself domestic violence.' " (*Id.* at p. 601.) The appellate court reversed and remanded, concluding that the violations were not "technical" and the conduct, if proven, would constitute "abuse" warranting issuance of the DVRO even without the existence of the TRO. (*Id.* at p. 603.) Here, unlike *N.T. v. H.T.*, Tinsley relies on a singular alleged violation of the TRO at Minor's October 2022 medical appointment and has not argued that such conduct would alone mandate the granting of his DVRO request even if the TRO had not been in effect.

Third, Tinsley argues that the trial court applied the wrong legal standard in determining whether Arnold's non-public social media posts constituted "abuse" under the DVPA. Specifically, he contends that the court imposed a "heightened" standard for "disturbing the peace" by requiring Tinsley prove injury and "wide dissemination" of the posts. But we read the trial court's findings—that there was no credible evidence of injury or viewing of the posts by anyone with proper access to Arnold's non-public accounts—as simply determining Tinsley had not shown "conduct that destroys the mental

14

or emotional calm of the other party" for "disturbing the peace" under the DVPA. (Cf. *Nadkarni*, *supra*, 173 Cal.App.4th at pp. 1497, 1499 [allegations of access, reading, and publicly disclosure of private emails causing " 'shock' and 'embarrassment,' " fear of destroyed business relationships, and fear for safety would be sufficient if proven]; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1421 [disclosing personal data downloaded from cell phone causing " 'extreme embarrassment, fear, and intimidation' " sufficient to warrant DVRO].)

*Curcio v. Pels* (2020) 47 Cal.App.5th 1 is also instructive. That case involved the issuance of a DVRO based on a private social media post stating, " 'CURCIO (yes, i just outted my abuser) was SEVERELY AND DISTURBINGLY ABUSIVE TO ME' " and "WHEN YOU BOOK HER ON YOUR SHOWS, BEFRIEND HER, PLAY ON IMPROV TEAMS WITH HER YOU, ARE ENABLING AN ABUSER. IT IS LIKE SUPPORTING A RAPIST . . . ." (*Id.* at p. 5.) The appellate court determined that the private post was insufficient to constitute abuse under the DVPA. (*Curcio*, at p. 13.) It explained: "Curcio understandably was upset by the social media post and it may have made her fear for her career, but we conclude it cannot be said to rise to the level of destruction of Curcio's mental and emotional calm, sufficient to support the issuance of a domestic violence restraining order." (*Ibid.*) Here, as in *Curcio*, Tinsley cites only one private post by Arnold that included the term "rapist" and even then, it did not identify Tinsley by name.

In sum, we conclude that the trial court did not abuse its discretion in denying Tinsley's DVRO request.

15

**C.** *Findings for Denial of Sole Custody Request*

### 1. Additional Background

Tinsley's DVRO application included a request to change the 2021 custody order, seeking sole legal and physical custody of Minor. In his motion for reconsideration of the 2022 order denying his sole custody request, Tinsley alleged there were new facts from unredacted police body camera footage regarding the September 2021 incident. Tinsley argued that the footage showed Arnold was placed on a Welfare and Institutions Code section 5150 hold as a result of the incident. Tinsley also argued that the footage showed Arnold had "multiple personality disorder" and made "recent threats and attempts at suicide," as the mother of Minor's nanny stated that Arnold had " 'an alter personality' " and Arnold's roommate stated that Arnold had purportedly told her she " 'had a knife to [her] throat like two months ago.' "

After the evidentiary hearing, the trial court denied Tinsley's DVRO request upon concluding that Arnold had not perpetrated domestic violence against him. It also denied Tinsley's motion for reconsideration, concluding there were no new facts sufficient to warrant reconsideration of the order denying sole custody to Tinsley. It found that the police had placed a Welfare and Institutions Code section 5150 hold on Arnold at the scene, but after being taken to the hospital to be examined by a psychiatrist, the psychiatrist cancelled the hold. It found that Arnold had informed the psychiatrist that they had borderline personality disorder, but that Arnold's mental health diagnosis did not affect Arnold's ability to care for Minor. It also found that Arnold was prescribed medication and had stopped taking it two weeks prior to the incident, but neither party had presented any evidence regarding the effects of the medication on the night in question.

16

**2. Analysis**

Tinsley argues that the trial court abused its discretion because it did not make sufficient findings in its order after the evidentiary hearing regarding (1) whether shared custody was in Minor's best interests or (2) the purported facts raised in his motion for reconsideration (statements regarding suicide, mental health diagnoses, and medication non-compliance). Tinsley cites *Montenegro v. Diaz* (2001) 26 Cal.4th 249 for the principle that an award of custody must be based on the "best interests" of the child. (*Id.* at p. 252.)

Tinsley misunderstands the scope of the evidentiary hearing and the court's subsequent order. The trial court was tasked with determining whether Tinsley had proven "abuse" by Arnold to support the issuance of the DVRO. (§ 6300, subd. (a).) It found Tinsley had not done so, and thus did not grant the relief he requested, including the request for sole custody of Minor. The court did not make any award of custody, and thus was not required to make any related "best interests" finding under *Montenegro v. Diaz*.

The trial court was also tasked with determining whether there were "new or different facts" warranting reconsideration of the order denying Tinsley's request for sole custody, a ruling that we review for abuse of discretion. (Code Civ. Proc., § 1008, subd. (a); *Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 265.)

Tinsley's motion argued there were new facts related to the September 2021 incident supporting his request. But the court concluded neither party had presented evidence that those purported facts had any effect on the incident or Arnold's ability to care for Minor. The court was not required to make any further findings regarding those purported facts.

We conclude that the trial court did not abuse its discretion in its findings denying the DVRO and motion for reconsideration. Having rejected each of Tinsley's specific arguments regarding error, we also reject his argument that the combination of errors necessitates reversal and remand.

## III. DISPOSITION

The February 23, 2023 order is affirmed. Respondent to recover costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
DOUGLAS, J.[*]

---

[*] Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.