Filed 10/8/13  Crane v. Clark CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER CRANE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>COLBY CLARK,<br><br>        Defendant and Respondent. | A134025<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-09-489352) |

Appellant Peter Crane (Crane) was a passenger in a taxi that was rear-ended by a station wagon driven by respondent Colby Clark (Clark), an accident for which Clark admitted liability.  Crane, who had a preexisting back condition, introduced evidence that in the three years following the accident he spent over $46,000 for medical care, and that future medical expenses could run over $2 million.  Crane also sought damages for past and future pain and suffering, the upshot of which was a closing argument that sought millions of dollars in damages.  Following brief deliberations, the jury awarded Crane $10,345, and the trial court denied his motion for new trial.

Crane appeals, primarily asserting three claims of evidentiary error:  (1) admitting evidence that contradicted unresponded-to requests for admission that had been deemed admitted; (2) admitting photographs of the taxi and the station wagon; and (3) admitting evidence that did not meet the standard for expert testimony.  He also asserts error in the denial of the new trial.  We conclude that none of Crane's contentions has merit, and we affirm.

1

# BACKGROUND

## The Complaint and the General Pretrial Proceedings

In June 2009 Crane, acting in pro per, filed a complaint for personal injury, naming as defendants Clark and Christopher Clark, her husband. The complaint was based on a motor vehicle accident on June 15, 2007 on Bush Street near its intersection with Powell, in San Francisco. Clark was the driver of the car, her husband the alleged owner.

In October 2009, represented by counsel, the Clarks filed an answer.[1]

On November 2, 2009 the case was set for jury trial for June 14, 2010.

On December 3, 2009, still representing himself, Crane served various discovery on Clark, including requests for production of documents, form interrogatories, and requests for admissions. The requests for admissions were nine in number, as follows:

No. 1: "Admit that, immediately prior to the COLLISION, the vehicle in which Plaintiff was sitting was in front of YOU at a complete stop for a red light on Bush Street at its intersection with Powell Street, in San Francisco, California."

No. 2: "Admit that, immediately prior to the COLLISION, YOU were looking at YOUR child in the back seat of YOUR VEHICLE."

No. 3: "Admit that, immediately prior to the COLLISION, YOU were holding a mobile phone."

No. 4: "Admit that YOU failed to act in a reasonable manner with regard to the operation of YOUR VEHICLE immediately prior to the COLLISION."

No. 5: "Admit that YOU violated California Vehicle Code §21703 immediately prior to the COLLISION."

No. 6: "Admit that, immediately prior to the COLLISION, YOU were exceeding the posted speed limit on Bush Street."

No. 7: "Admit that but for YOUR failure to pay attention to the vehicles in front of YOU, the COLLISION would not have occurred."

---

[1] Christopher Clark was ultimately dismissed from the action.

No. 8: "Admit that, immediately prior to the COLLISION, YOU did not apply the VEHICLE'S brakes."

No. 9: "Admit that, immediately prior to the COLLISION, YOU did not attempt to steer the VEHICLE away from the vehicle in which Plaintiff was sitting."

Clark provided no responses to any of the discovery.

On March 26, 2010, an attorney substituted in on behalf of Crane, and that same day filed motions to compel responses to the discovery, including, as pertinent here, to "deem admitted matters sought in requests for admissions to Colby Clark, Set One."

Crane's motions were unopposed, and by order of April 20, Judge Curtis Karnow ordered the motions "granted in their entirety." Thus, pursuant to Code of Civil Procedure section 2033.010, the facts in the requests for admissions were established, which facts included that "immediately prior to the collision" Clark:

was looking at her child in the back seat of her vehicle.

failed to act in a reasonable manner in operating her vehicle.

violated Vehicle Code section 21703.

was exceeding the posted speed limit on Bush Street.

The established facts also included admissions of causation and fault.

In late May 2010, Crane filed an ex parte application to continue the trial date, and by order of May 27, trial was continued to August 23, and then again to September 27, apparently by stipulation. Meanwhile, on August 18, new counsel substituted in for Clark, and later that month trial was again continued, to October 25.

In September 2010, Crane moved to augment his expert disclosure which, after some continuances, was denied on October 13, the register of actions indicating as follows: "[D]enied. Plaintiff has not acted diligently and allowing augmentation would prejudice defendant. In addition, the court indicated that the motion was denied without prejudice to parties requesting/seeking to continue the trial date."

Apparently no courtroom was available on October 25, and trial was continued to February 7, 2011. On November 1, 2010, Crane filed a motion for trial preference.

**The Attempts to Withdraw the Admissions**

On October 26, 2010, apparently while the case was on trial standby, Clark's new attorney filed an ex parte motion to withdraw the deemed admissions. The motion was denied, but Clark was permitted to file a noticed motion, which she did, on November 10, filing motions to withdraw and amend admissions and to reopen discovery. Hearing on the motions was set for November 17, on which date the motions were ordered "off calendar," to be heard in the law and motion department. The next pertinent entry in the register of actions is on December 23, which reads as follows: "Defendant Colby Clark's motion to withdraw and amend admissions; motion for an order to reopen discovery . . . . Defendant's request to have the matter heard at 9:30 AM so as to have the matter reported was denied. Argued and the court ruled as follows: motion to withdraw and amend admissions is denied without prejudice. Insufficient showing of prior counsel's mistake, inadvertence, or excusable neglect. Prejudice to plaintiff is demonstrated. Plaintiff has prepared the case since April believing these issues are not in contention, and the trial is currently set for February after the first trial date was continued. Motion to reopen discovery is granted for the limited issues surrounding the claim of need of a new surgical procedure related to the incident. This is without prejudice to making a motion to augment expert witness list. . . . Judge: Charlotte Walter Woolard; not reported."

On January 12, 2011, Clark's attorney renoticed the motion to withdraw and amend admissions. This motion was, for the first time, accompanied by a declaration of Clark's former attorney, offering his explanation for why no responses to the requests for admissions had been filed. Crane opposed the motion, and on the day it was scheduled for hearing the court ordered it "off calendar," to "be recalendared before Judge Woolard in Department 504." On February 3, the motion was heard by Judge Woolard and denied. Her order read as follows: "Defendant's Motion to Withdraw and Amend Admissions is DENIED without prejudice. Defendant made an insufficient showing of prior counsel's mistake, inadvertence, or excusable neglect. Prejudice to Plaintiff is demonstrated. Plaintiff has prepared the case since April believing these issues are not in

4

contention, and the trial is currently set for February after the first trial date was continued."

Trial was continued to February 8, on which date it in fact began.

## THE TRIAL

### Motions in Limine

The case was assigned for trial to the Honorable Michael I. Begert who, as will be seen, handled the case with great care and concern, particularly sensitive to the issue(s) presented by what was deemed established by the unresponded-to admissions. The case started with motions in limine, beginning with the six motions filed by Crane. The first three of those motions are particularly pertinent here, described by Crane as motions: (1) for issue sanctions and evidentiary sanctions against Clark to establish causation and liability, and to preclude mention of and exclude any documents not identified and/or produced during the course of discovery ; (2) to preclude evidence and statements contrary to the deemed admitted requests for admission; and (3) to preclude testimony of defendant's expert James Hughes.

The colloquy and holdings on the motions in limine bear significantly on some of the issues Crane raises here, and we thus recite what occurred at some length, beginning with motion no. 1. Among other things, this motion asked for exclusion of certain documents which, Crane argued, should have been produced pursuant to an April 20, 2010 discovery order and were in fact not produced until October 18, 2010. These included photographs of the vehicles involved in the accident as well as Clark's auto repair estimate. In the course of the extensive argument on this motion, the following colloquy occurred:

"THE COURT: Okay. Now, let me turn back to you, plaintiff's counsel. My issue with this is that these documents were turned over in discovery, albeit, not when they should have been turned over; but they were turned over. So you had—that differentiates you from the cases you've cited where the issue is surprise at trial. In other words, the one side wants to introduce documents that have never been seen before trial.

5

"You've actually had, because of the delays in this trial taking place, some period of months to conduct discovery based on these documents. So that's my problem with excluding the information at this point. It's basically a lack of prejudice and the fact that it's hard for me to find that defense counsel engaged in some kind of willful concealment when they were turned over during this expert's deposition.

"So you may respond to that."

"MR. BONAGOFSKY [CRANE'S COUNSEL]: Number one, I would like to say that we were given no notice, that I can see, as to who took the photos. They were just turned over. So they weren't authenticated. I had no opportunity to conduct fact discovery on them; and No. 2, those photographs are in direct contravention to these issues that were deemed admitted in the RFAs.

"So even if . . . the issue or evidentiary sanctions aren't granted because of the failure to turn them over to discovery, I think they still stay out because the RFAs and the photographs are inconsistent, and the law on that is clear. That no evidence can come in contrary to what an RFA says, right?

"THE COURT: I'll get to that in a second."

Following some back and forth, the argument on motion no. 1 ended with this:

"THE COURT: On the other hand, for plaintiff's counsel, my problem is that the information has been out there for a while, and I don't see indication that an aggressive effort was made to solve the problem other than to say, oh, they didn't give it to us, so it can't be used. That's my problem, is that this stuff, it looks to me at the absolute latest was in your possession in October of last year.

"MR. BONAGOFSKY: October 18th is when I got the photographs and the documents. . . . [¶] . . . [¶]

"THE COURT: Okay. So here's my ruling: I'm going to rule on Plaintiff's Motion in Limine Number 1 that the deemed admissions are admissions against the defendant. That was Judge Karnow's ruling. I don't see how you could interpret his ruling any other way. There was an attempt made to revisit Judge Karnow's ruling, and

6

based on both sides' representation, it's my understanding that that attempt was denied. So the admissions are deemed admitted.

"That said, the admission is literally going to be limited to what was admitted. If there is evidence that is not in direct contradiction to those admissions, I'll allow it. With respect to—I'm getting ahead of myself here because of a lot of these issues are bound up together, but with respect to the documents that were turned over in connection with Mr. Hughes' deposition, I am going to allow those if there is a proper foundation laid for those documents.

"And I am open to plaintiff's counsel's suggestions for ways that I can mitigate any prejudice to them by ordering that certain things happen before—certain discovery happens before defense counsel attempts to introduce those materials. So you may be heard, Counsel."

"MR. BONAGOFSKY: One issue I have is that we've actually moved to exclude Hughes' testimony in its entirety. His testimony is entirely based on the fact that the accident was between 0 an 3 miles an hour, which is directly in contravention to the admission that she was exceeding the speed limit at the time of the accident.

"THE COURT: I disagree with that, Counsel. The request for admission said 'immediately prior to.' Now, I think you're going to be able to impeach this witness pretty effectively with this admission; and I'm, of course, going to allow that impeachment to happen. But it's not necessarily inconsistent to say, 'immediately before she was going 30 miles an hour, in my opinion, she was going 5 miles an hour when she hit him.'

"MR. BONAGOFSKY: She also said she didn't apply her brakes.

"THE COURT: I understand. I understand. But it's not—it is not impossible for all three of those things could be true."

The argument ended with the understanding that the person who took the photographs—Jeffrey Harris, the taxi driver—would be deposed. And he was.

Judge Begert then turned to motion no. 2, to preclude evidence and statements contrary to the deemed admitted requests for admission. He began with the observation

7

that "I think we've already addressed this. In a literal sense I'm granting Motion in Limine No. 2, but we're gong to have to make a lot of decisions on the fly in order to implement that order. Like I said, I'm going to have to decide whether the testimony that's being—whether the evidence that's being offered is actually in direct contradiction to the request for admission.

"So you may be heard, Counsel.

"MS. FOGARI [CO-COUNSEL FOR CRANE]: Thank you, Your Honor.

"With respect to Motion in Limine No. 2, we would request that the report of the accident reconstructionist, Mr. Hughes, be deemed inadmissible because it relies solely on Ms. Clark's statements, as is given assumptions, and her statements are in contravention to the RFAs. And that's the basis for our motion.

"And given the deemed admitted order, Defendant should not be permitted to conduct an end run around the order by getting Mr. Hughes' report into evidence.

"THE COURT: Yeah, and I have ruled, with some reluctance, that because of the way the Request For Admissions is worded, it's not impossible that the Defendant could have been traveling at 5 miles an hour when she struck the cab in which Mr. Crane was traveling and have been traveling at 30 miles an hour immediately prior to that.

"MR. BONAGOFSKY: Can I address that, Your Honor?

"THE COURT: Yes.

"MR. BONAGOFSKY: Mr. Hughes testified at his deposition that the basis for his opinion was that Ms. Clark told him that she was stopped behind the cab with her foot on the brake, was 'turned around talking to her child, took her foot off the brake and coasted into the back of the cab at a very low rate of speed. So his entire opinion is based on something that is in direct contravention. I don't think you can read the basis for his opinion with the RFAs.

"THE COURT: Okay. Thank you for that clarification.

"My ruling is going to be that that is hearsay. I mean, that statement by the Defendant is hearsay. It's not admissible. He can't get it into evidence by saying this is what I relied on. Okay. He can say, 'These are my assumptions,' but he can't get her

8

testimony in that's in contravention to the admissions. And she can't testify in direct contradiction to the admissions. So you're going to have to advise your client that she's going to have to craft her testimony in—whatever she is going to say is going have to be consistent with those Request For Admissions. Is that clear?

"MR. BONAGOFSKY: Not really.

"THE COURT: Okay. So, for example, she can say—he can say 'My opinion is based on the assumption that she was going 0 to 5 miles an hour,' and then you can impeach it.

"MR. BONAGOFSKY: Okay.

"THE COURT: She can say, 'I was going between 0 and 5 miles an hour.' She cannot say 'that I was stopped' because that's contradicted by the Request For Admission. She cannot say that 'I applied the brakes' because that's in contradiction to the Request For Admission. Is that clear enough?

"MR. BONAGOFSKY: I understand.

"THE COURT: Okay. Do you understand that, Defense Counsel?

"MR. MORIARTY [COUNSEL FOR CLARK]: I think I do, Your Honor. I do. I'm just thinking it through my head explaining it to my client. My client is in a position, unfortunately, she never had the opportunity to—I'm with you, though.

"THE COURT: That's between her and her former counsel. But I'm stuck with where we are, and it's not easy. And I'm not entirely comfortable with it, but plaintiff's counsel has got a point on this and apparently it's been agreed with by more than one judge in this courthouse. So . . . [¶] . . . [¶]

"Okay. Mr. Moriarty, I've looked at the cases cited by plaintiff's counsel, and the cases weren't entirely persuasive to me on the point of evidence, contrary evidence being excluded as a result of an admission. However, the Rutter Guide that's referenced there was pretty clear on that point. If you have contrary authority, I would invite you to give it to me. In other words, authority that says just because I've admitted something doesn't mean I can't impeach myself by introducing evidence of the opposite. If you have authority that says that's okay, I would be interested in seeing that.

9

"MR. MORIARTY: I believe, Your Honor, in one of the supplementals that I provided to you, I spoke of a few cases. The first we were in agreement with, the literal reading of the request. And then the Court retains jurisdiction, the Frederick's versus Filbert Company . . . case. 189 Cal. App. 3d. [¶] . . . [¶] 'Court retains jurisdiction to determine the scope and effect of a party's admission. The Court may determine whether it accurately reflects the truth in light of other evidence in the case. This prevents requests for admission being misused as a device to hide or confuse issues.' [¶] In addition, the Milton versus Montgomery Ward Company case . . . 33 Cal. App. 3d 133 explains that the Court may simply read the admission differently than the propounding party expected. And the reason I bring those up is, one, with regard to the literal meaning of the request, the literal meaning it talks about immediately prior. And as the Court has pointed out, that is different than the moment of impact. And its also different from events leading up to the moment of impact. . . . [¶] . . . [¶]

"THE COURT: Okay. The way you described those cases, Mr. Moriarty, it sounds like they're consistent with what I'm saying, which is, you can't introduce evidence that's contradicted by the admission; but it remains my decision whether the evidence offered is contradicted by the admission. What I'm asking you is if you have any authority that says you can introduce evidence that's contradictory to the Request For Admission, I would be interested in seeing that.

"And, Counsel, let me just say, I just want to get these things right. So everybody has an opportunity to prove me wrong and you shouldn't be bashful about saying I'm wrong. But this is, you know, in my brief time looking at this case, these are the conclusions that I've reached. And so you're going to have to convince me that I should have reached a different conclusion. Okay.

"Plaintiff's In Limine Motion No. 3, to preclude the testimony of defendant expert James Hughes. I've already ruled on that. I think I would characterized that as it's denied, but I'm going to keep a tight leash on Mr. Hughes, and if you think we need a 402 on Mr. Hughes, I would be willing to entertain that.

"MR. BONAGOFSKY: We would request that, Your Honor.

10

"THE COURT: Okay. Keep me posted as to, you know, when you, think that's going to happen, and I think that's legitimate."

**Opening Statements**

With liability admitted, the only issue was damages, which damages would include medical expenses and pain and suffering. There was no claim for wage loss.

The background of how that issue would be developed, and the competing views of the evidence, was described in the opening statements. Thus, Crane's, where his attorney described him as follows: "Now, before the accident Mr. Crane was an active athlete. He was a former ski patrol at Squaw Valley, captain of his college ski team, he was a surfer, he was an active runner, he was in great shape. Since the accident he can no longer do most of those things without excruciating pain, and this is a result of the accident." The trial would be, as his counsel would later describe it, about a collision that caused "an aggravation of a preexisting lumbar injury."

Clark's counsel's version of what was involved was this: "[T]his case involves a minor rear-end accident . . . . Both vehicles drove away from the accident with no visible damage. . . . Defendant Colby Clark is admitting that she was negligent in coming into contact with the back of the cab, she makes no bones about that. She knows that she bumped the back of the cab and she admits to it. Plaintiff Peter Crane is in the back of a cab without a seatbelt on at the time of the accident. After this minor rear-end accident, Plaintiff Peter Crane, he's fine at the scene. . . . [P]laintiff also has no cuts, no bruises, no welts, nothing that's showing that there was any type of a trauma as a result of this bump. [¶] Police are not called to the scene. Paramedics or ambulance, not called to the scene. Both vehicles drive away from the scene. . . . [¶] . . . [¶] . . . Now, before this accident, plaintiff is suffering from low back problems."

**Evidence**

Much of the evidence is not germane to the issues before us, and we recite it only briefly, to provide some context. Crane was an attorney by training, 36 years old at the time of the accident. He had stopped practicing law in 2006, and at the time of the accident was as an entrepreneur helping to start small businesses.

11

As to the accident itself, there was relatively little evidence about it. Harris, the taxi driver, called as a witness by Crane, testified he was stopped for a light, chatting with Crane, his head turned slightly. "The next thing . . . I saw the logo of the steering wheel in my right eye. . . . [I]t was just a quick bang . . . and I asked [Crane] what happened, and he said the lady behind us just hit us." Crane's counsel asked Harris if the impact felt like a minor accident, and Harris stated he was not sure how to respond, and replied, "Some people rate accidents in terms of car damages." Counsel clarified that he was "referring to the forces exerted inside the cab, not to any damage to the cab or anything like that," and, then asked, "inside the cab, did it feel like a significant impact?" Harris responded in the affirmative. Harris also testified that the taxi moved forward "a little" upon impact.

Harris looked at Clark's station wagon after the accident, and saw no visible damage. He talked to Clark, exchanged information with her, and then drove Crane to his destination. Neither the police nor an ambulance was summoned.

On cross-examination, Harris was shown copies of photographs of the taxi taken after the accident, and testified he took the original photographs. Over Crane's objection (based on Harris's concerns over possible distortion of the photographs), and after questioning by Judge Begert, the photographs were admitted.

Crane testified he was in the backseat of the taxi, not wearing a seatbelt. He described the impact as a "violent jolt," and that he was thrown forward out of his seat, striking the roof of the cab, then the seat in front of him, ending up in the foot well between his seat and the front seat. He did not remember feeling any pain at that time and suffered no bruises, welts, or cuts. He confirmed that following the accident Harris drove him to his destination, a work-related charity event, where he went to ensure everything was running smoothly with his company's product and to meet people involved with the charity. He enjoyed a glass of wine, stayed for an hour or so, and went home.

Clark's testimony about the accident was especially brief. The reason was that prior to her testimony Judge Begert held a Evidence Code section 402 hearing,

12

necessitated by the matters admitted by the requests, at which Clark described what happened prior to the collision, including her actual speed prior to impact. Judge Begert ruled that Clark could not testify about her actual, pre-collision speed, or that she was stopped behind the taxi prior to impact, or the force of the impact, on the basis that such facts would be in direct contradiction of the deemed admissions. Clark was allowed to testify about what happened after impact, and confirmed that the pictures of the taxi represented what it looked like following the accident. Clark also testified that she and Harris inspected her car and the back of the taxi at the accident scene, and that there were some scratches on the vehicles.

As indicated, the main issue at trial was the extent of damages caused by the accident, against the background of Crane's preexisting medical condition. Much of the evidence came from Crane's doctors and other health care providers, including those who had treated Crane prior to the accident and, of course, from their records. Necessarily a significant witness on this issue was Crane himself, and he was examined in detail about his medical condition and complaints, and his conduct, both before the accident and after. And he did not acquit himself well, at times giving testimony at odds with the medical records, at other times claiming not to recall significant facts. A few illustrations should suffice.

To put the illustrations in perspective, Crane testified that he has skied since he was eight years old and in fact had raced in both slalom and giant slalom. Crane also surfed, and had since age 16. And, Crane admitted, he had experienced low back pain throughout his life after engaging in physical activities.

Physical therapist Rodney Heschong, who began treating Crane in December 2006, some six months before the accident, testified that in his initial evaluation Crane had complained of a "low back strain with a twisting in 2000, several injuries while skiing, mostly strains and sprains to the back." A chiropractor Crane went to in February 2007 testified that Crane told him that he had lower back pain and leg pain due to a surfing injury. Later asked about all this, Crane said he did not remember suffering any back or leg injury due to skiing or surfing.

13

Crane's first visit to a doctor after the June 15 accident was Monday, June 18. According to the note in the doctor's file, Crane presented "with several complaints. He did cut his leg on a barbed wire fence, and he was unsure of when his last tetanus booster was. . . . He also requested a Hepatitis A vaccine because he was traveling to Mexico and Central America for a surfing vacation. Patient also complained of neck pain after a whiplash injury two days ago. He was in the back seat of the cab and was rear-ended and notes neck pain and stiffness since the accident."

Questioned at length about this, Crane could remember nothing, absolutely nothing, about the barbed wire incident, and could not remember asking for a hepatitis shot, and did "not remember having a trip planned then." Crane's claimed inability to remember these facts, and myriad others, while on cross-examination prompted a question from a juror, who asked, "Mr. Crane, have you experienced memory problems in the past?" Crane answered yes, explaining that pain pills sometimes affect his memory.

In early 2010 Crane went skiing with his former ski team on a reunion weekend, where he fell. He posted a picture on his Facebook page showing him having fallen, with the caption: "Ski patrol forgot the cliff sign and I was lucky enough to fall in these trees before going over." In May 2010 Crane had surgery, a microdiscectomy.

On the issue of damages, Crane introduced evidence of past medical expenses totaling $46,707. This was comprised of some $24,000 for the surgery, plus MRIs, X-rays, chiropractic care, medical visits, prescription medications, and an epidural injection. Crane's physicians testified that future medical costs would be at least $200,000. This would include a second microdiscectomy, the minimum he would need, that would cost $40,000 to $55,000 and would take six months of recovery time. Follow-up treatment would include physical therapy, prescription medications, possible epidural injections, medical visits, additional MRIs and X-rays, and a spinal cord stimulator. One doctor testified that Crane might need a lumbar fusion, which would cost $200,000 to $225,000 and would take six months to a year of recovery time, for a total

14

cost of $352,100. And if Crane opted not to have surgery, the cost of ongoing medical care could reach $1.5 million.

Clark's medical expert testified that Crane did not sustain any objectively identifiable injury directly resulting from the accident, no objectively identifiable injury to the cervical, thoracic, or lumbar regions. Crane did have complaints of discomfort in those sites that were attributed by the treating providers to soft tissue injury or a strain or sprain. And, the expert opined, Crane's soft tissue injuries attributable to the accident were resolved by treatment within six weeks or so of the accident. The expert further opined that Crane did not aggravate his prior condition in the accident; did not sustain any objectively identifiable injury to his right lower extremity as a result of the accident; and did not suffer an injury to his lumbar low back and right lower extremity region as a result of the accident that was not present before the accident.

### Closing Arguments

Crane's counsel began his closing argument by "telling you again about Mr. Crane. Before the accident, despite the fact that he did have a lumbar disc injury, he was a happy, active, athletic guy who was an avid skier, former member of the ski patrol, mountain biker, mountain climber. He had done all kinds of athletic activities. He was in very good shape, and he recovered well from the prior disc injury. By April 5th, 2007, his symptoms were down to a level that Dr. Slosar and Dr. Melnik and Dr. Andrews all said made him not a surgical candidate. That changed after the accident." And so counsel defined the issue: Clark, driving carelessly, caused a collision that caused "an aggravation of preexisting lumbar injury."

Lengthy argument followed, culminating with the amount of damages for which Clark was responsible. They began with the $46,707 for past medical expenses. Turning to future medical expenses, counsel argued that these would range from $352,100 if Crane were to have surgery to $1.51 million if he did not. And on the issue of pain and suffering, using a per diem basis, counsel argued that $846,240 was appropriate for past pain and suffering, and $469,000 in "additional pain and suffering from today's date forward through the end of the recovery period if it [i.e., the surgery] works." If not,

15

counsel put forth some alternatives. The result of all this? "[A] total figure of $1,934,127."

Counsel concluded by reminding the jury of all of Clark's admissions, including that "immediately prior to the collision she was holding a mobile phone and she has admitted that immediately prior to the collision she was exceeding the posted speed limit on Bush Street. She has also admitted that immediately prior to the collision she did not apply the vehicle's brakes. . . . [¶] So the reason why these are important is that requests for admission are not like normal evidence. These are things that shove away any evidence that is in conflict with what she has admitted. No matter how powerful you think it is, no matter how convincing you might think certain photographs are of what really happened in this case.

"You must accept as true that she was going over 30 miles an hour immediately before the accident, did not hit her brakes, did not try to steer away, was turned around looking in the back seat holding a mobile phone."

The defense argument was relatively brief, a total of 20 pages in the transcript. The argument began with counsel reminding the jury that it had to use its "common sense," and from there focused primarily on the fact that the surgery did not take place until May 2010, some three years after the accident—and shortly after the fall depicted on Crane's Facebook page. And in the intervening period Crane had participated in the same type of vigorous activities like skiing, surfing, and scuba diving, as he had before. Counsel also noted the lack of corroborating testimony from any of Crane's friends or acquaintances. Finally, counsel commented on Crane's lack of credibility, focusing on the "six times . . . he was not true."

**Jury Instructions**

Judge Begert's instructions to the jury included CACI 210 (requests for admission), modified to also instruct that "you are not permitted to accept as true any evidence that contradicts facts admitted in a Request for Admission." The jury was also instructed on the speed limit with CACI Instruction 707, which informed the jury that the speed limited where the accident occurred was 30 miles per hour. And on the subject of

16

expert testimony, the jury was given CACI 219 (Expert Witness Testimony), 220 (Expert Questions Containing Assumed Facts), and 221 (Conflicting Expert Testimony).

Following instructions, a session was held outside the presence of the jury, at which various housekeeping matters were discussed. In the course of this session, Judge Begert made the following statement for the record: "Okay. One other thing I wanted to put on the record was that there was considerable discussion about requests for admission and their impact on the case. For the record, I allowed certain evidence to come into the case which was related to the subject matter of the request for admission. The Court did this pursuant to a case, *Fredericks v. Filbert Company*, which is 189 Cal.App.3d 272, and *Milton versus Montgomery Ward*, which is 33 Cal.App.3d 133. And, in addition, I advised the jury that they could not consider as true evidence which was contradicted by the request for admission. And that was based on *Murillo versus Superior Court*, 143 Cal.App.4th 730."

**Verdict**

The jury began its deliberations on the morning of February 23. Early that afternoon the jury returned its verdict, finding for Crane, and awarding $545 for past medical expenses and $9,800 for past pain and suffering, for a total of $10,345. The jury determined that Crane was also negligent, but that his negligence was not a substantial factor in causing his harm.

**Motion for New Trial**

On March 10, Crane filed a notice of intention to move for new trial, and on March 21 his brief in support of the motion together with the declaration of counsel and request for judicial notice. On April 11, Crane filed an augmented brief, augmented declaration of counsel, and augmented request for judicial notice. Clark filed opposition, and the motion was argued on April 29. On May 11, Judge Begert issued a comprehensive 15-page order denying it. After judgment was entered, Crane filed a timely appeal.

17

## DISCUSSION

### Introduction to the Issues: The Law Regarding Requests for Admissions

Crane's primary arguments assert evidentiary error, and underlying them is the effect of the matters deemed admitted by the unresponded to requests for admissions, and what evidence could thereafter be allowed at trial. We thus begin with some discussion about requests for admissions.

"The admission request differs fundamentally from the other five discovery tools (depositions, interrogatories, inspection demands, medical examinations, and expert witness exchanges). These devices principally seek to *obtain* proof for use at trial. In marked contrast, admission requests seek to *eliminate* the need for proof: '[T]he purpose of the admissions procedure . . . is to limit the triable issues and spare the parties the burden and expense of litigating undisputed issues.' Sometimes the admissions obtained will even leave the party making them vulnerable to summary judgment." (1 Hogan & Weber, California Civil Discovery (2d ed. 2005), § 9.1, p. 9-2, fns. omitted.)

As the Supreme Court noted long ago, requests for admission "are primarily aimed at setting at rest a triable issue so that it will not have to be tried. . . . For this reason, the fact that the request is for the admission of a controversial matter, or one involving complex facts, or calls for an opinion, is of no moment. If the litigant is able to make the admission, the time for making it is during discovery procedures, and not at the trial. . . ." (*Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 429; accord *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 672 [admitted facts preclude contrary evidence at trial].) In short, the objective of requests for admissions is to narrow the issues and save the time and expense of unnecessary proof at trial. (*Hillman v. Stults* (1968) 263 Cal.App.2d 848, 885.)

Code of Civil Procedure section 2033.280, subdivision (b), provides that when a responding party fails to respond timely to requests for admission, the requesting party may move for an order that "the truth of any matters specified in the requests be deemed admitted. . . ." Crane did that here, and his motion was granted, the effect of which is that the matters in the requests were "conclusively established." (Code Civ. Proc.,

18

§ 2033.410, subd. (a).)  As the leading practical treatise describes it, requests for admissions "are one of the most potent discovery weapons because whatever is admitted is *conclusive*."  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial (The Rutter Group 2013) [¶] 8:1257, p. 8G-1.)

That said, the treatise also notes this:

"**Trial judge's 'interpretation' of admission in light of other evidence:**  The court retains the discretion to determine the scope and effect of a party's admission.  The court may determine whether it accurately reflects the truth *in light of other evidence* in this case.  This prevents requests for admission being misused as a device to hide or confuse issues.  [Citation.]

(a) [8:1390.1]  For example, the trial judge may find an RFA deceptive because the admission is *susceptible to different meanings*.  [Citation. ] [¶] . . . [¶]

(b) [8.13903]  Or, the court may simply read the admission differently than the propounding party expected.  [Citation.]

(c) [8:1390.5]  *Compare—unambiguous admission:*  But if the response is unambiguous, there is no reason to construe it.  The matter admitted must be treated as 'conclusively established.'  [Citation.]."  (Weil & Brown, *supra,* at pp. 8G-33-8G-34.)

Three cases bear on the observations quoted above, shedding light on the subject of how a trial court is to deal with admitted requests for admission.

The first is *Milton v. Montgomery Ward & Co., Inc.* (1973) 33 Cal.App.3d 133 (*Milton*).  Milton slipped on defendant's premises and sued for personal injuries.  Defendant served 14 request for admissions, Milton did not respond, and the matters were deemed admitted, including no. 9 which read:  "Your only hospitalization for the injuries complained of was for approximately one hour and was at the Community Hospital of San Gabriel."  (*Id.* at pp. 136-137.)  The reality was that Milton had other hospitalizations, and at the start of trial his counsel asked if we are "bound in terms of our opening statement to the sole and single hospitalization?"  The court responded:  "Any hospitalization you want other than this particular hospital.  It is deemed admitted at this

19

point that he was one hour at this particular hospital. What other hospitals he went to I have not the slightest."

Evidence of other hospitalizations was admitted, and Milton received a plaintiff's verdict. Defendant appealed, and the Court of Appeal affirmed. It first confirmed that "after a matter is deemed admitted, the scope and effect of the admission must be determined by the trial court. The trial court has broad discretion in determining the admissibility and relevance of evidence." (*Milton, supra,* 33 Cal.App.3d at p. 138.) The court went on to hold that defendant's counsel had acquiesced in the court's interpretation of the admission, noting that defendant had in fact subpoenaed records from other hospitals and that defendant's expert witness was aware of other hospitalizations. Tellingly, the court concluded: "No injustice resulted from the introduction of the evidence of other hospitalizations. The court's ruling merely permitted the jury to determine the issues on their merits."[2] (*Milton, supra,* 33 Cal.App.3d at p. 139.)

The next case is *Fredericks v. Kontos Industries* (1987) 189 Cal.App.3d 272 (*Fredericks*), which, citing *Milton*, begins as follows: "Here we hold that an admission by a party under Code of Civil Procedure section 2033 is usually conclusive, but in certain cases the trial court has discretion to determine its scope and effect." (*Id.* at p.

---

[2] The Supreme Court has noted, albeit in a different context, that there could be an element of fortuity, if not unreality, involved in requests for admissions, especially if the request is unresponded to. Thus: "Parties often propound requests for admission covering the ultimate facts of the case that, if admitted, are outcome determinative. The propounding party who gets 'lucky' and receives no response then notices a motion for a deemed admitted order that, at a minimum results in the award of monetary sanctions. If the propounding party does not receive a response by the hearing, then, under *Courtesy Claims* [*Service v. Superior Court* (1990) 219 Cal.App.3d 52] and *St. Paul* [*& Marine Ins. v. Superior Court* (1992) 2 Cal.App.4th 843], he 'hits the jackpot' and 'wins' an irrevocable deemed admitted order disposing of the lawsuit. By permitting relief under [former Code of Civil Procedure section 2033,] subdivision (m) [currently codified at section 2033.300, subdivision (b)], we eliminate such undeserved windfalls and the resulting subversion of the policy favoring the resolution of lawsuits on the merits. [Citation.]" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 982-983.)

20

274, fn. omitted.) Fredericks, a builder and operator of movie theaters, sued Kontos, a provider of interior furnishings for such theaters. In response to a request for admission, Fredericks admitted that he "had agreed to make progressive payments to Kontos according to a schedule set forth in March 6 documents." (*Fredericks, supra,* 189 Cal.App.3d at p. 276.) At trial, Fredericks testified that although the progressive payments were to be made under the contract, they were dependent upon work being performed by Kontos, and that Kontos's intention at the time the contract was made was not to demand the May 1 payment until construction on the theater warranted it. In short, both parties did not intend the dates in the payment schedule to be sacrosanct. (*Id*. at pp. 277-278.)

After discussing *Milton*, the Court of Appeal observed as follows: "*Milton* recognized the power of the trial court to determine the admissibility and relevance of evidence related to admitted facts. Here, the trial court properly admitted evidence of the party's understanding of the progress payment schedule. Evidence of this understanding did not contradict the fact admitted, but rather explained it. The court must have discretion to admit evidence to elucidate and explain an admission, because the admission of a fact does not always reflect the party's reasonable understanding of that fact.

"It is through the court's discretion to determine the admissibility and relevance of evidence that a trial accurately reflects events rather than distorts them. An admission under section 2033, as a rule, conclusively establishes the fact admitted, but the admission of a fact may be deceptive when the fact admitted may have different meanings. Through the court's discretion to admit evidence that explains the scope and effect of such an admission, the court ensures that the request for the admission is not misused as a device to hide or confuse issues." (*Frederick's, supra,* 189 Cal.App.3d at p. 278.)

The third case, and the one on which Crane heavily relies, is *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264. Valerio, a subcontractor, sued the general contractor, alleging in the alternative breach of express written contract and

21

quantum meruit. The general contractor filed a cross-complaint, and in his answer to the cross-complaint Valerio admitted that a written contract between the parties existed. Valerio made a similar admission in his response to requests for admissions. At trial, however, Valerio took the position that no executed contract existed. The trial court concluded there was no contract because there was no mutuality of assent, and entered judgment on a quantum meruit theory.

The general contractor appealed, and the Court of Appeal reversed, holding that the trial court "failed to give conclusive effect to Valerio's judicial admissions regarding the existence of a written contract." (*Valerio v. Andrew Youngquist Construction, supra,* 103 Cal.App.4th at p. 1267.) The court concluded as follows: "Unlike the circumstances of *Fredericks v. Kontos Industries, Inc., supra,* [189 Cal.App.3d 272], there was no ambiguity in Valerio's understanding at the time he responded to the requests for admissions. Valerio clearly believed that a written contract existed. He admits that, at the time of the response, trial counsel labored under the 'misconception . . . that there was in place a fully executed written agreement between the parties.' Accordingly, there was no reason for the court to interpret the admission in order to resolve an ambiguity or reflect Valerio's reasonable understanding of the facts. Simply put, Valerio filed a mistaken response that he never later moved to amend or withdraw. Moreover, if Valerio disagreed that a written contract existed, he was required under Code of Civil Procedure section 2033, subdivision (f)(1)(B) to deny the portion of the requested admission that he considered untrue. Valerio was aware that he could qualify his admission, as reflected in his response to request for admission No. four. [¶] It is apparent from the court's remarks that motions to amend or withdraw would have been granted. While the result here is rigorous, the rule is clear and [defendant] is entitled to rely upon it." (*Valerio v. Andrew Youngquist Construction, supra,* 103 Cal.App.4th at pp. 1273–1274.)

**The Issue at Trial**

As mentioned above, one deemed admitted fact—that Clark was exceeding the 30 mile-per-hour speed limit—became the focal point on the question of what testimony could be admitted. And to put the issue in complete perspective—and to demonstrate

22

precisely what Judge Begert was concerned about—we quote the colloquy at the hearing on the new trial motion that well captures the point:

"THE COURT: Okay. Now, Mr. Bonagofsky, let me ask you this:

"Do you actually take the position that the real speed of Defendant's vehicle at the point of impact was in excess of 30 miles per hour?

"MR. BONAGOFSKY: I take the position that this Court, Department 302, by judicial fiat, established that that was the case.

"THE COURT: Okay. I'm asking you, independent of that, in the real world—

"MR. BONAGOFSKY: I have no idea. I wasn't there.

"THE COURT: Okay. Because the problem that I'm confronted with, and the problem I've been confronted with since the very beginning of this trial, is that I think the Requests for Admissions, which—which I never said were not deemed and were not admissions, that—We've always been in agreement that the Requests for Admissions are deemed admitted.

"The question has always been, what is the impact of that on this proceeding?

"And the challenge that that presented to me is that I was, therefore, operating in two different versions of reality.

"One is the reality that you referred to in your papers at one point as the judicial reality, which is that Ms. Clark was going in excess of the speed limit immediately prior to the collision.

"And the other reality was what I'll call the historical reality, which is that lots of evidence in this case was inconsistent with the judicial reality, including, I would say, the description that Mr. Crane had of what happened at the accident, the description that the taxicab driver gave of what happened at the accident, and these were witnesses that were called by the Plaintiff.

"So my question to you is: Do you have some legal authority that you can point me to that would explain how the Court can deal with exactly that situation where the admissions are clearly at odds with the historical reality of the case?

"MR. BONAGOFSKY:  All of the authority that I provided says that no contrary evidence can come in if it is contrary to the Requests for Admission.  That's the whole point of the RFA, is, no contrary evidence comes in.  That's why we have Requests for Admission.  That's the legal effect of the Request for Admission."

**Judge Begert Did Not Err in Connection With the Testimony of Hughes and Shimada**

Crane first contends that "the testimony of defense 'experts' . . . Hughes and . . . Shimada Contradicted the Judicial Admissions."  James Hughes was an expert in accident reconstruction, Sean Shimada, Ph.D. an expert in biomechanics.

The proceedings below included 402 hearings for both Hughes and Dr. Shimada.  The hearing for Hughes was extensive, that for Dr. Shimada, brief.  As pertinent to the issue here, Crane's counsel cross-examined Hughes extensively, with special reference to his deposition and his reference to the "delta velocity" of the taxi.  Further questions ensued, with Hughes referring to his deposition testimony that Clark was travelling "between zero and 3 miles an hour" at impact.  Judge Begert then asked some questions, the upshot of which was that Hughes said Clark was "travelling about 4.7 at the highest end."  Crane's counsel responded immediately:  "Based on that, your Honor, I think the RFAs preclude him from testifying."  There followed redirect examination from Clark's counsel, lengthy recross, and further redirect.  Judge Begert asked more questions, and then said that, following argument from Crane's counsel, he was ready to rule.  This argument followed:

"MR. BONAGOVSKY:  Mr. Hughes testified a moment ago that it was a matter of impossibility of physics for his results to have been consistent with what the RFAs say.  That being the case, I don't see how he can testify.

"He didn't testify to any of what he's saying right now at his deposition.  He gave me the testimony that I read to you. I think it's highly prejudicial for him to be allowed to testify to something entirely different from what he testified to in his deposition.  That's all.

"THE COURT:  Okay. Mr. Moriarty.

24

"MR. MORIARTY: Your Honor, that's all the subject of cross-examination.

"Mr. Hughes has explained that all of his calculations, all of his opinions and conclusions, are based on the physical evidence and there was no need for him to have any information or anything with regard to the speed of my client's vehicle at the moment of impact, or immediately prior to the moment of impact. It's not a factor in his analysis.

"And we're dealing with two separate issues. We have deemed admissions— We're admitting to the fault for the accident, Your Honor. We've admitted to that.

"What we're dealing with right now is the analysis of whether there is an injury claim and what the extent of that injury claim is.

"And as part of that analysis, we have an accident reconstructionist and a biomechanical expert that are doing their analysis based entirely, in the beginning, on the physical evidence. There's nothing that's contrary to these deemed admissions. We're admitting to the fact that we were negligent at the time of the incident.

"THE COURT: No. You're admitting to the fact that you were going 30-30 miles an hour or more. That's what you're admitting to.

"MR. MORIARTY: Understood.

"THE COURT: Okay. So I don't want to hear anything out of this witness that indicates that that vehicle was going less than 30 miles an hour.

"MR. MORIARTY: He is not going to.

"THE COURT: All right. I think this is a very difficult problem."

Counsel for Crane then said there was "[o]ne more piece of evidence that I'd like to put into the record, if I may," and was allowed to. It was as follows:

"MR. BONAGOVSKY: Mr. Hughes, what did you say was the G-force that you calculated in this accident?

"MR. HUGHES: Based upon the delta velocity between the two vehicles, the G-force was .98 Gs." Counsel then impeached Hughes with his deposition, ending with the observation that the deposition was "completely inconsistent with what he's going to testify to."

25

"THE COURT: Okay. I don't have any doubt that there will be some very interesting impeachment, but I'm going to allow the witness to testify.

"We have another issue that's come up in the course of this hearing, which is, one of the pieces of impeachment evidence is going to be that the estimate of the damage to the vehicle came from an insurance adjuster.

"So how are we going to deal with that?"

The discussion then turned to the subject of Crane's ability to use the insurance adjuster's estimate of damage to Clark's station wagon to impeach Hughes without introducing evidence of insurance. After some discussion, further testimony was elicited from Hughes in an effort to resolve the issue, the result of which was that Hughes agreed that he could give his opinion based on the photographs of damage to the vehicles and without using the damage estimate. At that stage of the proceeding, Crane's counsel objected, in the following language:

"MR. BONAGOFSKY: Your Honor, you see my problem with this, which is that it's—it's like a moving target. I took this deposition in October, and I'm faced with an entirely different thing now with an expert whose deposition I haven't taken on these topics.

"I think that his testimony, based on the math that's in front of him—and if Your Honor would take a look at, you'll see it's the same thing—is based on math that is inconsistent with the RFAs. That being the case, it cannot come in under CCP 2033. It cannot come in.

"Therefore, I don't think the witness should be allowed to testify. I think there's a lack of a reasonable basis for his expert opinion, given what we're hearing today.

"He can't just pick numbers out of thin air based on nothing. There's got to be a rational basis or else he's not—he's not competent to testify as an expert. [¶] . . . [¶] And this is like . . . [¶] . . . [¶] a *Kelly-Frye* problem."

Finally, after more discussion about how the estimate might be described, Judge Begert said he was prepared to rule. Then this occurred:

26

"THE COURT:  That's what I'm going to do.  I think that the probative value of this expert's testimony, at the end of the day, is going to be de minimis.

"But you're going to be able to cross-examine this witness on the fact that this was . . . the cost of repair estimate . . . on the Defendant's car was prepared by the Defendant.

"MR. BONAGOFSKY:  Not by the insurance company?

"THE COURT:  No.

"MR. BONAGOFSKY:  Your Honor, I—I want to—For the record I want to state a number of objections.

"THE COURT:  Okay.

"MR. BONAGOFSKY:  Number 1, I want to object that the estimate is not admissible.

"Number 2, I'm being hamstrung by the fact—

"THE COURT:  The estimate is not admissible, that's correct.

"MR. BONAGOFSKY:  I'm just trying to state some objections.

"THE COURT:  Yes.

"MR. BONAGOFSKY:  So—

"THE COURT:  And I want to be clear what my ruling is:  The estimate is not coming into evidence.

"MR. BONAGOFSKY:  Number 2, the fact that it was done by an insurance adjuster adds a layer of bias to this that I am being precluded from telling the jury about, and I think that's highly prejudicial.

"Number 3, I think that there is a lack of a sufficient basis for this expert's testimony.  Given what he testified to at the beginning of this hearing and what he's testifying to in response to these leading questions from Mr. Moriarty, it's a constantly moving target.

"The jury's not going to see that.  What they're going to see and hear is, they're going to hear the polished final product, now that he's had a chance to change his story three, four times, and I—I can do nothing about that.

"I think this is completely contrary to what the RFAs say happened in this case, which is, as we've discussed before, the judicial reality regardless of what the photos show.

"The photos of the Volvo are not in evidence. And they are so dark that—He admitted in his deposition that they told him very little. So how can he say anything that has a sufficient basis to allow his expert testimony to be admissible in the first instance, let alone cross-examination?

"I'm talking about whether or not he meets *Kelly-Frye* standards for expert testimony. He doesn't.

"THE COURT: Thank you, counsel. You've made your record."[3]

The 402 hearing for Dr. Shimada was brief, some four pages of transcript. He opined that Crane's injuries were not caused by the accident, an opinion based on his biomechanical analysis. Dr. Shimada further testified that the bases for his opinions included the force of impact calculations provided by Hughes. *Kelly-Frye* was not mentioned with respect to Dr. Shimada. Judge Begert ruled as follows: "So there's the same ruling with regard to this witness. [¶] Now, in order to address this . . . conflict—and I agree that there is some degree of conflict—Plaintiff's counsel is going to be able to read any Requests for Admission that he wants to read during the testimony of these experts. [¶] I believe, at the end of the case, there will be an instruction on expert witnesses and hypotheticals and that instruction will say that if the expert's opinion was based on assumptions that are not true, that the expert's opinion can be disregarded."

Against that background, both Hughes and Shimada were allowed to testify, and did. At the conclusion of Dr. Shimada's testimony, Crane requested that Judge Begert read to the jury the matters deemed admitted. Judge Begert agreed, adding at the end of each request that the matter was "admitted" and had to be accepted as true.

---

[3] Later, when Hughes was called to the stand, Crane's counsel asked to "have a standing objection . . . to this witness's testimony based on the 402 hearing." Judge Begert agreed.

Crane contends that the "trial testimony of . . . Hughes and . . . Shimada confirmed their opinions were directly at odds with the Judicial Admission." We disagree.

A similar argument was made below in Crane's motion for new trial, an argument rejected by Judge Begert in the course of his detailed 15-page order denying the motion. We cannot improve upon his comprehensive analysis, and we thus quote liberally from his order where, among other things, he noted as follows:

"During trial, the Court prevented Defendant from giving any testimony contradicting the admissions. At numerous points outside the presence of the jury, Defendant disputed the truth of the admissions, but the jury was not allowed to hear this testimony. In addition, the Court excluded any testimony from any witness that literally contradicted the admissions. In particular, the Court excluded any testimony that the speed of Defendant's vehicle at the point of impact or immediately prior to the collision was less than 30 miles per hour.

"Moreover, the Court introduced the admissions with considerable emphasis. Prior to reading the admissions to the jury, the Court read CACI 210 which states, in part: 'If the other party admits those matters, you must accept them as true.' The Court then read each of the requests for admission to the jury, followed by the statement: 'admitted.' " Then, after quoting Crane's closing argument reminding the jury what was admitted, Judge Begert quoted Crane's counsel, that " '[Mr. Hughes's] testimony about the speed of impact is completely inconsistent with those facts and you must disregard them because admissions trump all.' "

Judge Begert continued: "In a literal sense, the Court did not admit any evidence that contradicted the deemed admissions. Defendant was not allowed to testify that: (1) she was driving less than 30 miles per hour . . . [¶] On the other hand, both sides introduced evidence that was inconsistent with a 30-mile-per-hour rear-end impact. For example, Plaintiff called the cab driver to testify regarding the effect the impact had on him and Plaintiff. He described the impact on direct, and on cross-examination he stated that the impact did not move the taxi forward significantly. The cab driver also testified that he suffered no serious injuries, and he was able to drive back to Marin County after

29

the accident. Plaintiff testified that he suffered no broken bones or lacerations even though he was not wearing a seat belt. Defendant testified regarding how the collision felt and how her child reacted to it in the back seat. Defendant also testified about the lack of damage to her car and to the taxi. All of the witnesses testified that no one called for the police or an ambulance. All of the witnesses testified that both vehicles were driven away after the accident. No one testified that any airbags were deployed. Plaintiff testified that after the accident he went on to attend an event as planned. All of this evidence was inconsistent with a 30 mile-per-hour impact.

"The deemed admissions created two conflicting realities. In the historical version of reality, Defendant's car did not impact Plaintiff's taxi cab at a speed of 30 miles per hour and Plaintiff's injuries did not result from an impact of that magnitude. In what Plaintiff has described as the 'judicial reality,' however, Defendant's car was travelling at more than 30 miles per hour 'immediately prior to the collision.' Almost any information from the historical reality created conflicts with the judicial reality, and the degree of damage to the vehicles and people from the historical reality would be highly improbable if the judicial reality were true. This created challenges with regard to the admission of virtually all of the most probative evidence in the case (i.e., what really happened in the accident, and how badly did the accident injure Plaintiff?)

"Faced with these competing versions of reality, the Court drew the line as follows: other than the deemed admissions, no evidence regarding the speed of Defendant's car immediately prior to or at the point of impact would be admitted. Defendant was not permitted to introduce any testimony literally describing the speed of her car or disputing any of the other admissions. The Court excluded any evidence contradicting the literal language of the admissions. A great deal of evidence offered by both sides was, however, in tension with a 30 mile-per-hour impact.

Then, after easily rejecting Crane's claim about Dr. Shimada's testimony, Judge Begert concluded his analysis as follows:

"The only evidence that came close to contradicting the deemed admissions, was the testimony of Defendant's accident reconstruction expert, James Hughes.

30

"Prior to allowing Mr. Hughes to testify, the Court conducted a hearing outside the presence of the jury under Evidence Code Section 402. The following exchange between the Court and Mr. Hughes took place:

" 'THE COURT: What I'm confused by, Mr. Hughes, is, if you're saying—and I hear you saying—that the speed of the Volvo prior to the impact, that the—the stated speed of the Volvo before the impact was irrelevant to your expert testimony about the forces created by the impact; is that correct?

" 'MR. HUGHES: That's correct.' (Trial Transcript 2/17/2011 at 96:15-21.)

"Mr. Hughes also asserted that his opinion of the change in velocity was not based on the speed at impact. As a result, his testimony at trial was that his opinions were not based on facts in conflict with the deemed admissions.

"At the conclusion of that hearing, the Court stated: 'I don't want to hear anything out of this witness that indicates that that vehicle was going less than 30 miles an hour.' Defendant's counsel responded: 'He is not going to.' (Trial Transcript 2/17/2011 at 98:28-99:3.)

"After reciting his qualifications, Mr. Hughes's direct testimony lasted less than three pages. (Trial Transcript 2/17/2011 at 114:20-117:11.) Defendant did not elicit any testimony from Mr. Hughes regarding the speed of the Defendant's vehicle at or 'immediately prior to the collision.' As a result, Mr. Hughes never contradicted the deemed admissions literally.

"In his direct testimony to the jury, however, Mr. Hughes stated: 'So the differential between the two was about 4.7 miles an hour at the most extreme.' (Trial Transcript 2/17/2011 at 116:14-15.)

"Although this brief statement did not technically contain a statement of Defendant's speed immediately prior to impact, Plaintiff's counsel elicited the following testimony on cross-examination:

" 'Q: How is it physically possible, if she's exceeding 30 miles per hour immediately before the accident, that she impacts the back of the cab at 4.7 miles per hour?

31

" 'A:  Well, I said the speed differential between the two was 4.7 miles an hour. I don't know how fast the cab was going.

" 'Q:  The cab was stopped.

" 'A:  If the cab was stopped, then she could not poss—The damage on the rear of the cab isn't consistent with a—an impacting speed on the vehicle of 30 miles an hour, which would create a delta velocity of 14, 14—you know, roughly 14 miles an hour.  It's not consistent with the facts of the case or with the evidence." (Trial Transcript 2/17/2011 at 119:11-22.)

"Although Mr. Hughes did not testify that the impact speed was less than 30 miles per hour, he conceded that his opinion regarding "delta velocity" was impossible if the impact speed was 30 miles per hour.  Shortly after this testimony, Plaintiff's counsel moved for a mistrial.

"In closing argument, Plaintiff's counsel stated:  [¶] 'Mr. Hughes's opinion is based on those photographs of the cab which the cab driver said were not fair and accurate depictions of the cab and photographs and damage reports that they didn't show you . . . He was hired by the defendant to give a favorable opinion and his opinion is in conflict with the requests for admission that she was exceeding the speed limit 30 miles per hour and didn't hit her brakes right before the accident.  His testimony about the speed of impact is completely inconsistent with those facts and you must disregard them because admissions trump all.'

"On cross-examination, Mr. Hughes testified that the damage on which he based his delta velocity opinion was inconsistent with a speed in excess of 30 miles-per-hour immediately prior to the accident.  This opinion represents the greatest point of tension between what actually happened and the "judicial reality" created by the deemed admissions.  Plaintiff cannot complain, however, that testimony which resulted from his questioning violated the deemed admissions.  The Court finds that Mr. Hughes's testimony on direct examination did not contradict the literal meaning of the deemed admissions.  [¶] . . . [¶]

"Ultimately, the Court finds that the testimony of Mr. Hughes was not the basis of the jury's verdict. His testimony would have gone largely unnoticed without the cross-examination by Plaintiff's counsel. Other evidence introduced by Plaintiff, or without Plaintiff's objection, supported a verdict that the accident did not cause a severe injury to Plaintiff. As a result, Plaintiff has failed to demonstrate that the jury based its damage award on the testimony of Mr. Hughes."

We agree with that thorough analysis.

The matters deemed admitted by Clark about the facts "immediately prior to the accident" did not preclude evidence relating to the post-impact damage—perhaps more accurately, lack of damage—to the taxi. And the testimony of Hughes and Dr. Shimada was, as Judge Begert noted, limited by him.

Moreover, and as demonstrated above, the jury was instructed on several occasions that it had to accept as true the facts deemed admitted—and to disregard any opinions to the extent they were possibly contradictory to these facts. The jury is presumed to have followed the instructions, and that " 'its verdict reflects the legal limitations those instructions imposed.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.) The jury followed the instructions, found Clark liable for the accident, awarded Crane damages, and concluded that while Crane himself was negligent (in not wearing a seatbelt), his negligence was not a substantial factor in causing his injuries.

The verdict was consistent with the opinion of Clark's medical expert, that Crane's soft tissue injuries were resolved within six weeks of the accident. The jury was free to reject the opinion of Crane's experts, especially where Crane himself gave testimony inconsistent with the records of those experts and most especially in light of Crane's vigorous post-accident activities—at least until he fell while skiing.

Lastly we note that even if there had been error in connection with Hughes's testimony, his testimony was not, as Judge Begert noted, the basis of the verdict. To put it in Evidence Code terms, any such error would not have resulted in a miscarriage of justice. (Evid. Code, § 353.)

33

**The Photographs Were Properly Admitted**

Crane's second evidentiary argument is that Judge Begert improperly admitted photographs of the taxi, an argument premised on two separate bases: (1) the photographs had been improperly withheld during discovery and should have been disallowed as an evidentiary sanction under Code of Civil Procedure section 2033.030, subdivision (c), and under Evidence Code section 352; and (2) the photographs contradicted the admissions. Neither basis is persuasive.

As discussed in detail above, the photographs had been discussed at length in in limine motion no. 1. After that thorough hearing, Judge Begert ruled that they had been provided well before trial, and would not be precluded as a discovery sanction. We review such ruling denying for abuse of discretion. (See *New Albertsons Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422.) We find none.

It is true, as Crane contends, that a trial court has power to exclude evidence that was concealed by a party if it would cause "unfair surprise" if admitted. (See, e.g., *Deeter v. Angus* (1986) 179 Cal.App.3d 241, 255.) Here, the photographs were disclosed on October 18, 2010, more than three months before trial. Crane could hardly show surprise, especially as the photographs were taken by Harris, the taxi driver, who was called as a witness by Crane. In short, and as Judge Begert confirmed in his order denying a new trial, Crane "suffered no undue prejudice as a result of the disclosure of the photographs . . . months before trial began."

Crane's alternative basis, that the photographs contradicted the admissions, is fatuous. We see nothing in any admission addressing the post-accident condition of the taxi.

**Crane's *Kelly-Frye* Contention Has No Merit**

Crane's last evidentiary argument asserts error in "admitting evidence that did not meet the standard for expert testimony," specifically that the testimony of Hughes and Dr. Shimada did not satisfy "the standard for expert testimony under *People v. Kelly*

(1976) 17 Cal.3d 24 [(*Kelly*)]." Crane argues that the testimony failed all three prongs of the *Kelly/Frye* rule.[4] We deem the argument forfeited.

Evidence Code section 353 provides that a "verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

The effect of subdivision (a) is that to preserve a claim of evidentiary error, the objection must be specific: "Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)

The 402 hearing involving Hughes was discussed at length above. Any objective reading of what occurred there shows that Crane's fundamental objection, repeated over and over in the course of the 30 page hearing transcript, was that Hughes's testimony should be excluded because it was inconsistent with the facts deemed admitted in the requests for admissions—in his words, because the testimony was "inconsistent with the RFAs." Crane made no reference to the scientific soundness of Hughes's opinion, no objection that his analysis lacked a recognized scientific basis. In light of this, the general statement at the conclusion of the 402 hearing that there was a "*Kelly/Frye*

---

[4] The *Kelly/Frye* rule provides that "a new scientific technique must be ' " . . . sufficiently established to have gained general acceptance in the particular field in which it belongs[,]" ' in order to be admissible in evidence. [Citation.] The proponent of the evidence bears the burden of proving a consensus of opinion and must establish (1) the reliability of the method, usually by expert testimony; (2) the qualifications of the witness providing the testimony; and (3) that correct scientific procedures were used in the particular case. [Citation.]" (*People v. Morris* (1988) 199 Cal.App.3d 377, 386.)

problem" is insufficient to preserve the claim Crane asserts here. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [party's failure to object to scientific evidence on *Kelly/Frye* grounds in the trial court results in the forfeiture of the argument on appeal]; *People v. Kaurish* (1990) 52 Cal.3d 648, 688 [same]; also see *People v. Modell* (1956) 143 Cal.App.2d 724, where the objection to an expert's testimony involving experimental evidence was that a " 'proper foundation has not been laid.' " (*Id.* at p. 728.) The Court of Appeal held that the objection was waived due to the failure to refer to the precise alleged defects in the expert's testimony: "Any question as to the reliability of the experiment could have been answered readily in the trial court." (*Id.* at p. 731.).)

### Judge Begert Did Not Err in Denying a New Trial

Crane's final argument, brief indeed, is that Judge Begert erred in denying his motion for new trial because Hughes's testimony constituted surprise. Crane asserts that Hughes's testimony "at his deposition differed materially from his testimony at the 402 hearing and then at trial in a number of respects." So, the argument runs, "[t]his testimony constituted surprise that had a materially adverse effect on Crane's case. Not only was [Crane] forced to try to discredit Hughes by using the judicial admissions, he was then faced with Hughes's constantly moving testimony and testimony that came in after a direct exclusion order from the court. The trial court erred by denying the motion for a new trial." We are not persuaded.

Code of Civil Procedure section 657, subdivision (3), provides that a new trial may be granted on the ground of "accident or surprise, which ordinary prudence could not have guarded against." To begin with, new trial motions on this ground are to be viewed with "suspicion" and are " 'seldom successful.' " (*Fletcher v. Pierceall* (1956) 46 Cal.App.2d 859, 866.) And to succeed on this ground, Crane had to show three conditions: (1) an accident or surprise, i.e., something unforeseen, happened during the trial (*Kauffman v. De Mutiis* (1948) 31 Cal.2d 429, 432); (2) prejudice, i.e., that the surprise had a material adverse effect on his case; and (3) diligence, i.e., the surprise is one that could not have been guarded against. (*HATA v. Los Angeles County/UCLA*

36

*Medical Center* (1995) 31 Cal.App.4th 1791, 1806.) Crane's showing does not measure up.

A reading of Hughes's deposition shows that Crane was on notice prior to trial that Hughes was relying on more than just Clark's statements to support his opinion as to how the accident happened. For example, Hughes testified at deposition about the change in velocity, testimony based upon his examination of the damage to the vehicles as indicated in the photographs, and also the repair estimate for Clark's station wagon. The transcript further demonstrated that Hughes also relied on the bumper strengths and other physical characteristics of the vehicles. And Clark's estimates about her speed at impact were consistent with, but not necessary to, Hughes's analysis, which was a mathematical conclusion he drew from his change in velocity analysis. This is hardly surprise.

Denying the motion for new trial, Judge Begert concluded that Hughes's brief testimony was of little impact in light of the entire record of the case. Further, any error or prejudice was cured by the direction given to the jury by the court immediately following the testimony of Hughes and Dr. Shimada, that it must accept the deemed admissions as true, followed by a reading of those admissions. In short, the motion did not demonstrate that Hughes's testimony substantially affected the jurors or that a different result could reasonably be expected if his testimony were excluded. We see no reason to reverse. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872; *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.)

**DISPOSITION**

The judgment is affirmed.

_____
Richman, J.

I concur:

_____
Haerle, J.

37

Concurring opinion of Kline, P.J.

Any matter admitted or deemed admitted in response to a request for admissions "is *conclusively* established against the party making the admission in the pending action," unless, as is not the case here, the court has permitted withdrawal of that admission. (Code Civ. Proc., § 2033.410, subd. (a), italics added.) Therefore, while a court may utilize evidence to elucidate and explain an admission, it cannot permit such evidence to be used to contradict the plain meaning of a response to a request for admissions or deemed admissions. (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271; *Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 260-261.) As Justice Corrigan pointed out in *Valerio*, a party who has made (or is deemed to have made) an admission " 'cannot offer contrary evidence *unless permitted to amend*, and a judgment may rest in whole or in part upon the admission without proof of the fact." (*Valerio, supra*, at p. 1272, quoting 4 Witkin Cal. Procedure [(5th ed. 2008)] Pleading, [§ 454, p. 587.)] As she also noted, the result of the rule is "rigorous, [but] the rule is clear" and the adverse party "is entitled to rely upon it." (*Id*. at pp. 1273-1274.)

Clark sought to withdraw the admissions three times, but none of those efforts succeeded. The rulings of other judges in those proceedings in favor of Crane were, however, effectively undone by the trial court, as was the rule of law.

The trial court's finding "that Mr. Hughes's testimony on direct examination did not contradict the literal meaning of the deemed admissions" is disingenuous. Taken as a whole, as undoubtedly it was by the jury, Hughes's testimony unquestionably contradicted the literal meaning of the deemed admissions. I know not whether, in the mind of the trial court, that is the "historical" or the "judicial" reality; but it is in either event the operative fact. This could easily have been prevented, and should have been, but was not.

1

I concur in the judgment only because I agree with my colleagues that the record does not show Hughes's testimony substantially affected the jurors or that a different result could reasonably be expected if his testimony were excluded.

_____

Kline, P.J.

2